## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD., FTX TRADING LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES INC. (d/b/a FTX.US), | Adv. Pro. 23-50584 (JTD) |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | |
| ALLAN JOSEPH BANKMAN and BARBARA FRIED, | |
| Defendants. | |

Debtors and debtors in possession Alameda Research LLC ("Alameda"), Alameda Research Ltd. ("Alameda Ltd."), FTX Trading Ltd. ("FTX Trading"), West Realm Shires, Inc. ("WRS"), and West Realm Shires Services Inc. (d/b/a FTX.US) ("FTX US") (together, "Plaintiffs") in the above-captioned chapter 11 cases (the "Chapter 11 Cases" and each a "Chapter 11 Case") file this First Amended Complaint to recover damages caused by fraudulent transfers, breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, unjust enrichment,

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

knowing assistance or knowing receipt, aiding and abetting fraud, and other wrongdoing, and to avoid and recover fraudulent transfers. Plaintiffs allege the following based upon personal knowledge and upon their investigation to date, and upon information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.      This action seeks to recover millions of dollars in fraudulently transferred and misappropriated funds from the parents of FTX Founder Samuel Bankman-Fried ("Bankman-Fried"): his father, Defendant Allan Joseph Bankman ("Bankman"), and his mother, Defendant Barbara Fried ("Fried"). As Bankman-Fried's parents, Bankman and Fried exploited their access and influence within the FTX enterprise to enrich themselves, directly and indirectly, by millions of dollars, and knowingly at the expense of the debtors in these Chapter 11 Cases (the "Debtors" or the "FTX Group")[2] and their creditors.

2.      Despite presenting itself to investors and the public as a sophisticated group of cryptocurrency exchanges and businesses, the FTX Group was a self-described "family business." It has since been revealed to have been fueled by fraud, perpetrated by and for the benefit of a group of insiders, including: Bankman-Fried, Daniel Friedberg ("Friedberg"), Zixiao "Gary" Wang ("Wang"), Nishad Singh ("Singh"), and Caroline Ellison ("Ellison") (collectively, with

---

[2]     The "Debtors" comprise the named Plaintiffs and affiliated entities that each filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware on November 11, 2022 and November 14, 2022.

The "FTX Group" comprises the Debtors, as well as non-Debtor affiliated entities. Specifically, the "FTX Group" refers to the four silos: (a) a group composed of Plaintiff and Debtor WRS and its Debtor and non-Debtor subsidiaries; (b) a group composed of Plaintiffs and Debtors Alameda Research LLC, Alameda Research Ltd. and their Debtor subsidiaries; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc., and Debtor FTX Ventures Ltd.; and (d) a group composed of Plaintiff and Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

Bankman, the "FTX Insiders" or "Insiders").  Bankman played a key role in perpetuating this culture of misrepresentations and gross mismanagement and helped cover up allegations that would have exposed the fraud committed by the FTX Insiders.  And together, Bankman and Fried siphoned millions of dollars out of the FTX Group for their own personal benefit and their chosen pet causes.  This action seeks to hold them accountable for their misconduct and recover assets for the Debtors' creditors.

3.     ***Defendant Bankman***:  Bankman is a tenured Stanford Law School professor with decades of experience in tax law.  He utilized this background, and his relationship with his son, Bankman-Fried, to position himself as an insider at the center of the FTX Group.  Bankman recognized and took full advantage of his insider status, explaining in February 2021 that he was "very involved in the business."  Indeed, Bankman proudly touted that he was an early investor in Alameda—the proprietary trading arm of the FTX Group that its Insiders used to misappropriate billions of dollars in customer and investor funds.

4.     Bankman acted as an officer, director, and/or manager of Alameda, Alameda Ltd., FTX Trading, and FTX US, and did so with Bankman-Fried's knowledge and consent.  In those roles as officer, director, and/or manager of Alameda, Alameda Ltd., FTX Trading, and FTX US, Bankman had broad authority to make decisions for each entity and the FTX Group at large, and advised the FTX Group and associated entities with regard to both business and legal affairs.  In January 2021, FTX Trading, Alameda Ltd., and WRS formally retained Bankman as *pro bono* counsel to advise them and their subsidiaries and affiliates on "general corporate and tax matters"—despite the fact that he had already been doing so for several years.  Later in 2021, Bankman became formally employed by FTX US as Senior Advisor of the FTX Foundation, which in late 2022 was renamed "FTX Philanthropy."

5.      In addition to his formal roles, Bankman had broad authority to make decisions for the FTX Group as a *de facto* officer, director, and/or manager.  Although the Debtors have not identified a specific document memorializing Bankman's appointment, this is unsurprising given the disregard of corporate formalities within the FTX Group and the FTX Group's practice of auto-deleting Signal messages.  What is far more telling is that Bankman did, in fact, operate as an officer, director, and/or manager of at least four entities within the FTX Group (Alameda, Alameda Ltd., FTX Trading, and FTX US), and did so while working hand-in-glove with Bankman-Fried.

6.      FTX US General Counsel described Bankman as a "strategic advisor to and general overseer of the FTX businesses" and someone who "acts as outside general counsel for Alameda[.]"  Bankman was indeed identified in an internal document as a member of the FTX Group "Management Team" alongside only six other individuals who also held executive positions.  Among other things, Bankman hand-selected recipients of FTX Group charitable contributions, managed related tax deductions and tax issues generally, strategized about the issuance of hundreds of millions of dollars in loans from FTX Group entities to individuals, advised on whether applicants should be hired, entered into and terminated contracts with outside contractors on behalf of the FTX Group, recommended the acquisition of property in The Bahamas, and frequently participated in other executive-level discussions, including those on establishing FTX-affiliated entities and creating asset protection trusts.

7.      Throughout, Bankman portrayed himself as the proverbial adult in the room—and was uniquely positioned to fulfill that role—as he worked alongside inexperienced fellow executive officers, directors, and managers responsible for safeguarding billions of dollars.  Given his background and positions, and the ear of his son Bankman-Fried, Bankman was well-placed to insist on and implement internal controls and raise alarms about the misconduct within the FTX

Group.  Bankman, instead, stayed silent and in at least one instance, helped hush a complainant whose allegations threatened to expose the fraud within the FTX Group.

8.      Bankman was richly rewarded for helping perpetuate the FTX Insiders' fraud.  He received millions of dollars in unearned "gifts" and real property, flew on privately-chartered jets, expensed $1,200 per night hotel stays to the FTX Group, and even appeared in a Super Bowl commercial with Seinfeld writer Larry David months before the FTX Group imploded.

9.      Bankman used his status as an insider to funnel vast sums of FTX Group money to his chosen causes, including his employer, Stanford University.  Bankman also showered his friends and family with gifts, which were paid for by the FTX Group.  As just one example, he gave a former Stanford Law School student who later became outside counsel to the FTX Group "a free trip to France," which included airline tickets and tickets to the Formula 1 Grand Prix in France costing several thousand dollars.  As a tenured law professor and a well-published tax law scholar, Bankman knew that his receipt and involvement in these transfers were breaches of his fiduciary duties.

10.      ***Defendant Fried***:  Bankman's domestic partner, Fried, was likewise a Stanford Law School professor who willingly enmeshed herself in the FTX Insiders' world.  Describing herself as her son Bankman-Fried's "partner in crime of the noncriminal sort," Fried served as the single most influential advisor regarding Bankman-Fried's and the FTX Group's political contributions, and repeatedly "dunned," or called upon, Bankman-Fried and Singh, Alameda's Head of Engineering, to contribute millions of dollars directly to Mind the Gap, Inc. ("MTG"), a political action committee that she co-founded and for which she served as President and Chairwoman, or the organizations MTG supported.

11.     Together, Bankman's and Fried's influence and control over FTX Group funds expanded as the FTX Group plunged deeper into insolvency.  As has been detailed extensively in criminal indictments, prior civil lawsuits, and reports filed and issued by the Debtors' bankruptcy estates, far from genuine profit generation, the exponential growth and purported success of the FTX Group was driven by a host of reckless and fraudulent practices perpetrated by and for the benefit of the FTX Insiders.  These practices included, among others, placing billions of dollars in wildly speculative and unhedged bets in crypto assets and frenzied investment in hundreds of imprudent "ventures," paid for using commingled and misappropriated funds.

12.     Bankman and Fried, tenured professors at what currently is ranked as the top U.S. law school, either knew—or ignored bright red flags revealing—that their son, Bankman-Fried, and other FTX Insiders were orchestrating a vast fraudulent scheme to profit and promote their personal and charitable agendas at the Debtors' expense.

13.     Despite knowing or blatantly ignoring that the FTX Group was insolvent or on the brink of insolvency, Bankman and Fried discussed with Bankman-Fried the transfer to them of a $10 million cash gift and a $16.4 million luxury property in The Bahamas.  Bankman and Fried also pushed for tens of millions of dollars in political and charitable contributions, including to Stanford University, which were seemingly designed to boost Bankman's and Fried's professional and social status at the expense of the FTX Group, and by extension, its customers and other creditors.  Additionally, Fried, concerned with the optics of her son and his companies donating money to the organization she co-founded and other causes she supported, encouraged Bankman-Fried and others within the FTX Group to avoid (if not violate) federal campaign finance disclosure rules by engaging in straw donations or otherwise concealing the FTX Group as the source of the contributions.

14.     Plaintiffs bring this action against Bankman for intentional and constructive fraudulent transfer, breaches of fiduciary duties, aiding and abetting breaches of fiduciary duty, unjust enrichment, knowing assistance or knowing receipt, and disallowance of claims; against Fried for intentional and constructive fraudulent transfer, aiding and abetting breaches of fiduciary duties, aiding and abetting fraud, unjust enrichment, and disallowance of claims; and against both Defendants for damages, as well as to avoid and recover from Defendants (or from any other person or entity for whose benefit the transfers were made or obligations incurred) all transfers of property of Plaintiffs and all obligations of Plaintiffs to Defendants made prior to the commencement of the Chapter 11 Cases by Plaintiffs.

15.     On November 11 and November 14, 2022 (as applicable, the "Petition Date"), Plaintiffs filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  No trustee has been appointed for Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022.[3]  Accordingly, Plaintiffs have the authority to file a complaint to commence, and thereafter to prosecute, this proceeding.  As detailed herein, fraudulent transfers were made for the benefit of Defendants and such transfers are avoidable under the Bankruptcy Code and applicable non-bankruptcy law, including Delaware Code Annotated Title 6, §§ 1304 and 1305 and California Civil Code §§ 3439.04 and 3439.05.

16.     Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to disallow and equitably subordinate any and all claims filed or held by Defendants in these Chapter 11 Cases

---

[3]     *See* Case No. 22-11068 (JTD), [D.I. 128].

unless and until Defendants have relinquished to Plaintiffs all property that Defendants received in transfers determined by the Court to be avoidable and recoverable under the Bankruptcy Code.

17.     Plaintiffs are continuing to receive materials relevant to their claims against Bankman and Fried, even through the date of the filing of this First Amended Complaint. Plaintiffs accordingly reserve the right to amend this First Amended Complaint or file additional actions against Defendants, as appropriate, to protect the interests of their estates.

## RELEVANT PARTIES

18.     Debtor Alameda is a Delaware limited liability company that had operations in the United States, Hong Kong, and The Bahamas. Bankman-Fried and Tara Mac Aulay ("Mac Aulay") co-founded Alameda in or around November 2017, and its sole equity owners were Bankman-Fried (90%) and Wang (10%). Bankman-Fried was the Chief Executive Officer ("CEO") of Alameda from its inception until around October 2021. At all relevant times, Bankman-Fried retained substantial control over Alameda.

19.     Debtor Alameda Ltd., a subsidiary of Alameda, is incorporated under the laws of the British Virgin Islands.

20.     Debtor FTX Trading is incorporated under the laws of Antigua and Barbuda. FTX Trading is approximately 80% owned by Paper Bird Inc. ("Paper Bird"), a Delaware corporation that is wholly owned by Bankman-Fried,[4] who served as CEO, Chief Financial Officer ("CFO"), President, and Secretary of Paper Bird beginning on September 19, 2021. The remaining approximately 20% of FTX Trading is owned by hundreds of minority shareholders, including FTX Group employees and various investment funds.

---

[4]    Wang holds an unexercised warrant, issued November 10, 2019, to purchase 249 shares of common stock (24.9%) of Paper Bird Inc.

21.     Debtor WRS is a Delaware corporation that is 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Singh, and 22.25% owned by other shareholders.  It began operations in or around January 2020.

22.     Debtor FTX US is a Delaware corporation and a wholly owned subsidiary of WRS.

23.     Defendant Bankman is the father of Bankman-Fried, the domestic partner of Fried, a professor at Stanford Law School, and an attorney licensed in the State of California.  Bankman was employed by FTX US as Senior Advisor to the FTX Foundation in December 2021 and served as *pro bono* counsel to FTX Trading, Alameda Ltd., and WRS, and each of their subsidiaries and affiliates, beginning in at least January 2021.  Bankman currently resides in Palo Alto, California, and is also a permanent resident of The Bahamas.

24.     Defendant Fried is the mother of Bankman-Fried, the domestic partner of Bankman, a professor emerita at Stanford Law School, and co-founder of MTG, an independent expenditure-only political action committee dedicated to helping Democratic political candidates win elections.  Fried was not formally employed by any Debtor entity.  Fried currently resides in Palo Alto, California, and is also a permanent resident of The Bahamas.

## JURISDICTION AND VENUE

25.     This is a proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

26.     This proceeding relates to the Chapter 11 Cases filed with this Court on the Petition Date.  This Court has original jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it relates to the Chapter 11 Cases, brought under title 11 of the United States Code (the "Bankruptcy Code").

27.     Counts IX through XIII are core proceedings which may be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2).  Counts I through VIII are non-core proceedings, but are related to the Chapter 11 Cases.

28.     In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs confirm their consent to the entry of a final order or judgment by the Court in connection with this adversary proceeding to the extent that it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

29.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a), and is consistent with the interests of justice, judicial economy, and fairness.

## FACTUAL BACKGROUND

### I.     THE FTX GROUP'S FOUNDING

30.     The formation of the FTX Group has been fully detailed in various indictments and prior pleadings in the Chapter 11 Cases.[5]

31.     As relevant here, in November 2017, Bankman-Fried and Mac Aulay co-founded Alameda, which they described as a quantitative trading firm focused on cryptocurrency. Alameda's initial focus was arbitrage trading—exploiting price differences between cryptocurrencies (mainly Bitcoin) in the United States and Foreign Jurisdiction-1, where Bitcoin traded at a roughly 10% to 20% premium.  As part of this arbitrage trading strategy, and undisclosed to the public, Alameda skirted regulations and engaged a resident of Foreign

---

[5]     *See, e.g.*, First Day Declaration of John J. Ray III (filed Nov. 17, 2022) [D.I. 24] ("First Day Declaration") and Third Superseding Indictment, *United States v. Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Aug. 14, 2022), ECF No. 202.

Jurisdiction-1 to falsely represent that Alameda's and the FTX Insiders' trades were in fact his own personal trades.

32.    As the price gaps exploited by Alameda closed, Alameda attempted to generate profits by making highly speculative bets on cryptocurrency.  Alameda executives failed to maintain appropriate records and did not implement sufficient internal controls or risk management.  Indeed, multiple former high-level FTX Group executives have stated publicly that they left the FTX Group due to risk management, governance, and compliance concerns.  These executives include Mac Aulay and the former President of FTX US.

33.    In 2019, Bankman-Fried and Wang created FTX.com, a cryptocurrency exchange.

34.    FTX.com quickly became one of the largest digital asset exchanges in the world. Following the initial success of FTX.com, in January 2020, Bankman-Fried founded FTX US, which hosted FTX.US (together with FTX.com, the "Exchanges"), a digital asset exchange for U.S.-based customers.

35.    The Exchanges were extraordinarily successful in attracting customers and their cash and cryptocurrency.  By 2021, the Exchanges claimed to hold approximately $15 billion in assets on their platforms and to transact $16 billion in daily trading volume.  As of January 2022, FTX Trading was purported to be valued at $32 billion, and FTX US at $8 billion.

36.    But, as the world learned in November 2022, in reality, the FTX.com exchange served as a piggy bank from which FTX Insiders funded billions of dollars in recklessly speculative and unhedged trading by Alameda.  The FTX Insiders also withdrew billions more for purported "venture" investments, real estate purchases, purported personal "loans," charitable and political contributions, and all manner of other transfers designed to benefit themselves by enhancing their lifestyles, ingratiating themselves with business prospects and potential allies, and lining their own

and their families' and friends' pockets.  Defendants Bankman and Fried, who are family members of Bankman-Fried (his parents) and are themselves insiders or aiders and abettors, helped perpetuate and benefited from this fraudulent largesse.

## II.    THE "FAMILY BUSINESS"

37.    Although Bankman-Fried has asserted that his parents "weren't involved in any of the relevant parts" of the business, the truth is that Bankman and Fried were very much involved—from the founding of the FTX Group until its collapse.  As early as 2018, Bankman described Alameda as a "family business"—a phrase he repeatedly used to refer to the FTX Group.  Even as the FTX Group descended into insolvency, Bankman and Fried profited handsomely from this "family business."

### A.    Bankman's Role in the Rise and Fall of the FTX Group

38.    Bankman graduated from Yale Law School in 1980 and is a licensed attorney and licensed psychologist.  For the past 35 years, Bankman has been a professor at Stanford Law School.  As a leading scholar in United States tax policy, Bankman has testified multiple times before Congress.  Bankman has authored four scholarly treatises on federal income taxation and has published at least twenty law review articles and chapters about topics ranging from corporate tax shelters to wealth taxes.  According to his curriculum vitae, Bankman has delivered presentations to prominent audiences such as the United States Tax Court, the California Franchise Tax Board, and the Assembly Revenue and Taxation Committee for the State of California.  At Stanford Law School, Bankman has taught courses on partnership tax and mental health law, among other subjects.

39.    As early as 2018, Bankman provided legal and business advice to Alameda, despite having no official title or documented employment arrangement at the time.  Bankman's extensive role in the FTX Group, as detailed below, makes clear that Bankman-Fried appointed Bankman as

an officer, director, and/or manager of Alameda, Alameda Ltd., FTX Trading, and FTX US.  The

lack of a specific document memorializing this appointment is wholly unsurprising given the

disregard of corporate formalities within the FTX Group and the FTX Group's practice of auto-

deleting Signal messages.[6]  The FTX Group's lack of recordkeeping and organization was so

complete that Bankman-Fried admitted that he did not know whether he was the sole member of

the boards of the various entities he controlled, much less the identities of other board members.[7]

Indeed, the lack of accurate documentation was consistent across the board, with Bankman-Fried

testifying that he often signed documents long after their effective date.[8]  The FTX Group's culture

of disdain for official titles compounded these problems, such that the precise roles of company

officials who wielded enormous power within the FTX Group were not always clear, even to other

Insiders.

40.     In the early days of the FTX Group, Bankman's standing in the legal community,

and position as Bankman-Fried's father, allowed him to play a significant role in the business of

the FTX Group.  For example, in early 2018, Bankman connected Bankman-Fried with the

accounting firm that would later serve as the primary accountant to the FTX Group ("Accounting

Firm-1").  Bankman also selected the law firm to serve as the FTX Group's outside counsel ("Law

Firm-1"), and advocated for hiring Friedberg, a partner at Law Firm-1 at the time, as the effective

general counsel of the FTX Group.  As Bankman explained in March 2021: "FWIW, I interviewed

lots of firms for my son's company and *chose [Law Firm-1]*.  And let me tell you, *I felt I had a lot*

*riding on that decision*[.]"  (Emphasis added.)  In late 2018, Bankman advised about merging

---

[6]  Trial Transcript, *United States v. Bankman-Fried*, 22-cr-00673 (S.D.N.Y.) ("Trial Tr."),
175:19–176:18.

[7]  Trial Tr. 2709:1–17.

[8]  Trial Tr. 2702:8–13.

corporate entities and establishing bank accounts.  Indeed, by 2019, Bankman was referring to the

organization of the FTX Group as "*our* corporate structure[.]"  (Emphasis added.)

41.     On or around January 14, 2021, Bankman formalized aspects of his role at the FTX

Group.  He entered into an agreement to provide legal services to FTX Trading, Alameda Ltd.,

and WRS, and each of their subsidiaries and affiliates, regarding general corporate and tax matters

on a *pro bono* basis.  Bankman-Fried signed the agreement on behalf of the entities.  Thus, by

February 2021, as Bankman put it, it was a "factual reality" that he was "very involved in the

business."  ███████████████████████████████████████████

████████  By January 2021, if not earlier, Bankman served as a *de facto* officer, director, and/or

manager of FTX Trading, Alameda, Alameda Ltd., and FTX US.

42.     On or around December 28, 2021, Bankman entered into a written employment

agreement with FTX US as Senior Advisor to the FTX Foundation.  In July 2022, the FTX

Foundation was renamed FTX Philanthropy.  Bankman continued in his role until his resignation,

which became effective at the time of the filing of the Chapter 11 Cases.

43.     Bankman interacted with employees and affiliates and operated across the FTX

Group and related entities in a manner reflecting his high-level executive status.  Bankman was

deeply enmeshed in and wielded significant influence over the FTX Group since the founding of

the FTX Group entities.  Bankman was virtually the only grown-up in the room, guiding the FTX

Group and other executives, many of whom were recent college graduates in their mid-20s and

had never before run a company, let alone managed billions of dollars.  FTX US General Counsel

described Bankman as a "strategic advisor to and general overseer of the FTX businesses" and

someone who "acts as outside general counsel for Alameda[.]"

44.     Bankman's enlarged role permeated the FTX Group, so much so that he functioned as a corporate officer, director, and/or manager.  He made significant executive-level decisions for the FTX Group (some of which were retroactively approved or rubber-stamped by Bankman-Fried) including directing payments for FTX Trading, Alameda, Alameda Ltd., and FTX US, selecting recipients of charitable donations made by entities affiliated with and funded by the FTX Group, entering into and terminating contracts with outside consultants on behalf of the FTX Group, authorizing an FTX Group employee to hire consultants in The Bahamas, and signing agreements on behalf of FTX US.  Indeed, Bankman hand-selected Law Firm-1, the FTX Group's outside counsel, and pushed for the FTX Group to hire Friedberg as in-house and outside counsel for Alameda.  He also introduced Accounting Firm-1 to the FTX Group, the sole accounting firm ultimately engaged by the FTX Group.

45.     Bankman also interviewed and made hiring recommendations regarding candidates for employment with FTX US, pushed for board and advisory positions for his "friend of the family," and vetted potential CFO candidates.  In his leadership role, Bankman discussed with Friedberg the relationship between FTX Trading and Alameda under U.S. Securities and Exchange Commission regulations, developed a charitable giving strategy for the FTX Group, advocated for the FTX Group to market itself as a leader in customer satisfaction in response to regulatory scrutiny about consumer fraud, and helped steer the incorporation of FTX Trading.

46.     In addition, Bankman authorized expenses to be paid by the FTX Group, such as $1,200 per night hotels for himself and plane tickets and tickets to the Formula 1 Grand Prix in France (what he called "a free trip to France") for a student at Stanford Law School who later became outside counsel to the FTX Group.  Bankman's access and authority within FTX Trading,

Alameda, Alameda Ltd., and FTX US gave him a *de facto* officer, director, and/or manager role at each.

47.     Bankman was well aware that outside parties, too, relied on him for direction as it related to decisions for the FTX Group.  Three examples follow.  In a May 2019 email, personnel from Accounting Firm-1 expressed interest in scheduling a meeting "to discuss the best organization structure strategy for the Antigua Exchange operations and how it will interplay with Alameda Research . . . as well as the tax implications for Sam[,] the possibility of the mingling of crypto assets owned by Alameda Research and the Antigua entity[, and] the types of agreements that might need to be drafted between the entities."  Bankman replied, "I am guessing that [partner at Law Firm-1] and I are the two most important folks for this call."  In July 2020, Friedberg, who was then-FTX Group Chief Regulatory Officer, Chief Compliance Officer, and General Counsel, proposed a call with Law Firm-1 and Bankman to discuss the tax implications of a potential acquisition of another company's stock, reiterating that "I'd like Joe on this [call]."  And on August 5, 2021, Friedberg instructed Law Firm-1 to "hold off on [] state filings [for an FTX Group entity] until we hear from Joe B[.]"

48.     Likewise, Bankman's outsized role at the FTX Group was known throughout the FTX Group.  In February 2022, FTX Trading Head of Global Luxury Partnerships, while providing Bankman-Fried with pointers in advance of a meeting with Vogue's Editor-in-Chief, recommended that he "mention the role your Dad and brother play behind the scenes supporting you at FTX and in Washington alike."  And in a September 2022 internal document intended "to help illustrate FTX US's structure (organizational, personnel, workflows, etc.)," Bankman was listed as part of the "Management Team," alongside only Bankman-Fried, Friedberg, Wang, FTX US Head of Policy, FTX US General Counsel, and the CEO of FTX US Derivatives.

49.     ***Bankman Ignored Red Flags***:  Given his credentials and background, Bankman was well-equipped to see the true nature of the FTX Group's business.  Bankman observed and participated in the FTX Group's operations and business practices with the training and knowledge of a sophisticated law professor and the perceptiveness of a clinically-trained psychologist.  But when red flags about the operations and business practices surfaced, Bankman chose to ignore them.

50.     For example, as described by John J. Ray III, the Debtors' current CEO, "[t]he FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets."[9]  Even after learning about a lawsuit filed against FTX Trading, Alameda, Alameda Ltd., and others in November 2019 alleging, among other things, cryptocurrency price manipulation through pump and dump schemes, money laundering, operation of an unlicensed money transmitter business, unfair business practices, and violations of the Commodity Exchange Act, at no time did Bankman insist, or even suggest, that the FTX Group conduct an internal investigation or review to determine whether the claims had any credible basis—much less remediate any control failures.

51.     Bankman was also aware of and involved in discussions about hundreds of millions of dollars in highly suspect FTX Group loans to FTX Group employees, including fellow Insiders. For example, in September 2022, Bankman acknowledged that "Alameda has distributed a lot of money to [the CEO of FTX DM], which he has used to make political donations," and that the two had "talked about categorizing these as loans."  On November 9, 2022, two days before the first of the Debtors' bankruptcy filings, Bankman received a message on the encrypted messaging application Signal (which was frequently set to auto-delete sent and received messages) inquiring

---

[9]     *First Day Declaration*, ¶ 65.

about his, Friedberg's, FTX Trading General Counsel's, and a Law Firm-1 partner's availability to "discuss the employee loans/property purchases."

52.     ***Bankman Learned About Significant FTX Group Liabilities Incurred in 2021:*** Bankman was privy to sensitive financial matters and business affairs.  From mid to late 2021, he learned about (and at times participated in the decision to incur) significant liabilities on behalf of the FTX Group, including loans to certain FTX Insiders.

53.     In July 2021, Bankman learned from Friedberg that Bankman-Fried had negotiated a buyback of cryptocurrency exchange Binance's shares of FTX Trading, and that Bankman-Fried, Wang, and Singh would "personally . . . receive loans from [Alameda Ltd.] to cover this cost." Bankman, who in 2019 participated in initial discussions concerning Binance's investment in FTX Trading, worked with Law Firm-1, Friedberg, and the General Counsel of FTX Trading to buy back Binance's preferred shares in FTX Trading for almost $2.3 billion in 2021.

54.     In addition, Bankman knew that Alameda had loaned Bankman-Fried millions of dollars, including at least $750,750 in or around August 2021.

55.     Then, in late November 2021, Bankman, Law Firm-1, Friedberg, and FTX Trading General Counsel were involved in the decision to loan Singh almost $478 million from Alameda Ltd. so that Singh could exercise his option to purchase 43 million shares of FTX Trading.  Singh promised to repay the full amount to Alameda Ltd.  Singh's promissory note contained no requirement that he pledge any collateral.[10]  Singh testified at Bankman-Fried's criminal trial that Bankman was one of a handful of lawyers, including Friedberg, with whom he consulted regarding this loan.[11]

---

[10]   *See FTX Trading Ltd. v. Samuel Bankman-Fried*, et. al., No. 22-11068 (Bankr. D. Del. Jul. 20, 2023) [D.I. 1886] ¶¶ 77–79.

[11]   Trial Tr. 1515:5–8.

56.    ***Bankman Was Privy to Details Regarding Debtor Assets:***    Bankman was also privy to sensitive financial information regarding the FTX Group.  For example, in late January 2020, Bankman emailed Bankman-Fried, the co-CEO of FTX DM Ryan Salame ("Salame"), and a partner at Law Firm-1:  "We need to come to reasonable positions w/r/t transfers of services and property between Cottonwood and FTX and Alameda.  We need to [] keep our accountants in the loop."

57.    Since at least December 2019, Bankman received and/or downloaded electronic files containing financial information relating to the FTX Group, including Alameda's "2018 Client Copy Tax Return.pdf", FTX US's "2020 Estimated Payment Voucher.pdf", and WRS's "2020 Client Copy Tax Return.pdf."

58.    In October 2021, an employee at Accounting Firm-1 circulated "a list of who to send the Alameda drafts to when they're ready[,]" with Bankman listed first, followed by Bankman-Fried, Friedberg, Ellison, and five others.  Accounting Firm-1 then furnished the bylaws, certificate of incorporation, and other registration-related documents for North Dimension Inc. ("North Dimension"), a Debtor and shell company with no employees or legitimate business purpose that was able to obtain a bank account after falsely characterizing itself as a trading firm, and as a result, received tens of millions of dollars in customer funds intended for the FTX.com exchange.  That same month, Accounting Firm-1 also sent Bankman an electronic copy of North Dimension's "2020 Client Copy Tax Return.pdf."

59.    ***Bankman Knew That FTX Trading Had Legal Exposure in Facilitating Alameda's Arbitrage Strategy:***    In Alameda's early days, certain FTX Insiders, including Bankman-Fried, realized that Bitcoin sold for a premium on certain international cryptocurrency exchanges, such as in Foreign Jurisdiction-1.  Accordingly, those FTX Insiders implemented an

arbitrage strategy by buying Bitcoin on other exchanges and then selling it on Foreign Jurisdiction-1 exchanges.

60.     The arbitrage strategy proved a potential gold mine for those FTX Insiders.  But even this early trading by certain FTX Insiders was rife with deceit:  many Foreign Jurisdiction-1 exchanges limited trading to Foreign Jurisdiction-1 residents and corporations founded in Foreign Jurisdiction-1.  The early FTX Insiders were not Foreign Jurisdiction-1 residents, and Alameda was not founded in Foreign Jurisdiction-1.

61.     Nonetheless, Friedberg and Law-Firm-1, with Bankman's knowledge and participation, created a solution (the "Foreign Arbitrage Strategy").  As part of this strategy, Alameda hired a Foreign Jurisdiction-1 resident (who was not a Foreign Jurisdiction-1 national) to act as a "nominee entity," and as Alameda's agent and nominee, in order to trade on Foreign Jurisdiction-1 exchanges on Alameda's behalf.  In late December 2017, an Alameda employee emailed Friedberg (a then-partner at Law Firm-1), copying Bankman and others, requesting a "nominee agreement" for Account Holder-1.

62.     Account Holder-1 opened an account on a Foreign Jurisdiction-1 exchange under his own name in or around December 2017.  Account Holder-1 allowed Alameda to conduct cryptocurrency transactions on the exchange through his account, transferred the transaction funds into his personal bank account, and then wired the funds to Alameda.  Account Holder-1 summarized this strategy to Bankman, Bankman-Fried, and Friedberg in October 2019:  "I let Alameda sign up to cryptocurrency exchanges using my name, address, passport number, etc.  So on paper it looks like I conducted transactions there, but it was actually Alameda."

63.     The Foreign Arbitrage Strategy resulted in a windfall for certain FTX Insiders.  The arbitrage earned enough money for Account Holder-1 to send Alameda more than $1 million per

day.  But as Bankman, Friedberg, certain other FTX Insiders, and Law-Firm-1 knew, the Foreign Arbitrage Strategy that helped get Alameda off the ground carried legal risks.

64.     Bankman, Bankman-Fried, Friedberg, Law Firm-1, and others became aware of issues with the Foreign Arbitrage Strategy almost as soon as it began.  Foreign Jurisdiction-1 lawyers at another large law firm flagged serious issues with the strategy in late December 2017.

65.     Then, in January 2018, Bankman and others received a memorandum drafted by another large law firm opining that Account Holder-1 "likely [] may not engage in the Current Model and has been violating the PSA [Foreign Jurisdiction-1 Payment Services Act].  There are criminal punishment for violation of the PSA.  To avoid any accomplice liabilities, we recommend that Alameda should stop the Current Model as soon as possible."  A few days later, Friedberg acknowledged that "we are already aware that the nominee relationship creates issues with respect to the exchange/bank terms in both the US and Foreign Jurisdiction-1.  No need for any firm to write a memo on this.  This is the reason we are uncomfortable with the nominee relationship."

66.     Despite red flags concerning the Foreign Arbitrage Strategy, Bankman did nothing to shut it down, and Account Holder-1 continued trading on behalf of Alameda and certain FTX Insiders for at least two more months, through March 2018.

67.     Within a few months, the Foreign Arbitrage Strategy fell apart.  In March 2018, Account Holder-1 attempted to withdraw approximately $1.3 million dollars from a cryptocurrency exchange, but inadvertently "mentioned [during a phone call with the exchange] that he was trading on behalf of a company."  As a result, the exchange froze the account.  Later, in 2019, Foreign Jurisdiction-1 tax examiners confronted Account Holder-1, prompting him to write a post-mortem memorandum detailing various aspects of the Foreign Arbitrage Strategy.

68.     ***Rather Than Help the FTX Group Develop into a Mature Corporate Conglomerate, Bankman Focused on Wealth Preservation and Bankruptcy Protections for FTX Insiders:***  In November 2021, on the day before Singh signed and finalized the promissory note, Bankman began discussions about bankruptcy protection for the FTX Group.  FTX Trading General Counsel, in an email including Bankman, asked Law Firm-1 to schedule a call to discuss "how assets including primary residence can be structured to be *bankruptcy-remote*."  (Emphasis added.)

69.     The following day, Bankman initiated a discussion with Friedberg and FTX Trading General Counsel, opining that, "[i]t would be great, all else equal, if we could, have the founders put money into property in the Bahamas," included a link to https://www.offshorecompany.com/trusts/bahamas-asset-protection/, and sprang into action to find outside counsel to pursue this effort.  After collecting viewpoints from a fellow Stanford Law School professor, local counsel in The Bahamas, and his brother-in-law, Bankman determined that an overseas asset protection trust was "something we might use when we buy property in the Bahamas," but "the real issue is whether these things work in the US, and to what extent…."

70.     ***Bankman's Involvement Increased as the FTX Group Veered Towards Bankruptcy:***  Bankman's involvement with—and benefits from and at the expense of—the FTX Group increased toward the end of 2021, so much so that in December 2021, Bankman took a leave of absence from Stanford Law School to focus on the FTX Group.  In December 2021, Bankman instructed an FTX US employee: "I am no longer getting paid by Stanford, cuz I'm on leave.  So you should have me on salary, starting Dec. 1."

71.     With the start of his formal employment as Senior Advisor to the FTX Foundation the same month he went on leave from Stanford Law School, Bankman became even more

embroiled in the FTX Group's dealings.  While Bankman's employment contract provided him with a $200,000 annual salary and the possibility of a discretionary bonus, Bankman's insider status and influence on his son and throughout the FTX Group earned him and Fried considerably more, both financially and in ways that provided substantial benefits to each.

72.     On January 12, 2022, despite Bankman's employment agreement with FTX US detailing a $200,000 annual salary, Bankman complained to FTX US Head of Administration that he was receiving gross pay of only $16,667 per month from FTX US, when he was "supposed to be getting $1M/yr, starting in December.  So that would be a bit more than $80,000 a month, gross…"  Bankman promptly brought his discontent to Bankman-Fried's attention, emailing his son, "Gee, Sam I don't know what to say here.  This is the first [I] have heard of the 200K a year salary!  Putting Barbara on this."  In other words, Bankman lobbied his son to massively increase his own salary.

73.     Bankman's influence paid off, not only for him, but for Fried too.  Within two weeks, Bankman-Fried gifted Bankman and Fried together $10 million in funds originating from Alameda Ltd.  Within three months, Bankman-Fried caused the couple to be deeded a $16.4 million property in The Bahamas paid for with funds ultimately provided by FTX Trading.  Bankman and Fried enjoyed the benefits of more than $150,000 in expenses, paid for by FTX Trading, for their Bahamian residence.  Bankman also received an option to purchase 4.5 million shares of WRS and 1,008,000 shares of FTX Trading in November 2021.

74.     Bankman received other benefits as well.  For example, at his request, Bankman received a cameo appearance alongside Larry David in a now-infamous 2022 FTX Super Bowl commercial.  Bankman pushed for his role in the commercial, stating bluntly, "OK, I'm not a star-fucker and don't really care about meeting, say, Tom Brady.  But Larry David…."

75. ***Bankman Helped the FTX Group Navigate Tax Issues***:    Bankman had considerable discretion on tax matters across various FTX Group entities.  In January 2022, in a discussion about retaining outside counsel, presumably for the FTX Foundation, Bankman expressed his "preference for keeping things in-house, so to speak [because] we are always trading off tax issues among individuals and entities."  Bankman provided an example of discussions about gift taxes in which he was involved, where "[w]e considered having funds made available by Sam through Arabella,[12] through our own 501(c)(3), through a foreign entity with a 501(c)(3)-like charter, and through Alameda as a public benefit corporation."  This meant that Bankman had unfettered access to the FTX Group's financials and corporate structure—two things that would have alerted him that money was moving between and among the FTX Exchanges, FTX Insiders, and other legal entities.

76.    Bankman at times acted without Bankman-Fried's direct involvement—a sign of how prominent Bankman had become in the FTX Group's day-to-day operations.  For example, in relation to a tax-related conversation with Accounting Firm-1, he wrote: "I don't think we necessarily have to involve Sam right now."

77. ***Bankman Helped Other FTX Insiders Dissipate FTX Group Funds on Donations:***  Bankman also had substantial discretion on FTX Group-funded charitable giving.  As he told the FTX Foundation's CEO in 2022: "Just talked to Sam. *We agreed that things like this would get shunted to me*.  I'd talk to marketing and make decisions.  We'd fund them from FTX or Alameda*.  I make a decision* - depending on nature of the activity, beneficiary etc whether or

---

[12]    Arabella Advisors, a consulting firm focused on larger-scale philanthropy, established and managed the New Venture Fund, a non-profit organization that offered a platform through which FTX.US and FTX.com, and their donors could contribute to select charitable causes.  Bankman sat on the FTX advisory board to the New Venture Fund, which provided advice on such charitable contributions.

not to put them under the umbrella of FTX Community."  (Emphases added).  FTX US's Head of

Partnerships, too, understood that FTX Community "[] would include [] Joe[']s pet projects[.]"

78.     As with tax issues, Bankman had considerable leeway in directing charitable

donations, at one point writing of a donation: "I know Sam etc is/are on board with it."  In another

instance, Friedberg mentioned that the FTX Group planned to "give away" two of three Chevy

Suburban vehicles that were purchased for the FTX Group by a third party (who was later

reimbursed by Alameda Ltd. a total of $240,038.26 for all three vehicles) after Friedberg realized

that "we sort of fucked up here [by authorizing the purchases]."  Addressing how to handle the

purchased vehicles, Friedberg noted that "Sam's dad will deal with this" and that "[J]oe is choosing

a charity[.]"  Indeed, Bankman shopped around for organizations that would accept the vehicles,

writing to a former professional athlete, "Can your foundation use the car?"

79.     Bankman also authorized the making of donations from various FTX Group and

affiliated entities, suggesting that it was of little significance from *which* FTX Group entity the

donation was made.  For example, in July 2022, Bankman instructed FTX US's Head of

Administration to make a $50,000 donation from the FTX Foundation, adding, "if that is difficult,

we can just send it from FTX.us."  Personal notes that appear to have been taken by FTX US's

Head of Partnerships during a meeting that Bankman attended and during which potential FTX

Foundation projects were discussed read:  "WHERE DOES THE MONEY COME FROM?

DOESN'T SEEM TO MATTER TO [sic] MUCH."

80.     Some of Bankman's work at the FTX Group resulted in a flagrant waste of FTX

Group funds.  For example, one of Bankman's pet projects—the "FTX Million Dollar Hackathon

and Crypto Summit"—was a high-profile and expensive bust.  Bankman oversaw the Hackathon,

held at the Miami Heat Arena (which at the time was named "FTX Arena" due to the FTX Group's

paid sponsorship) in May 2021.  To spearhead this project, Bankman chose his sister, who also served as a consultant to FTX US as Director of the FTX Florida Charity Campaign.  At Bankman's instruction, his sister was paid $14,000 per month.  In the end, the Hackathon—attended by fewer than 1,200 people (in an arena that sits more than 19,000) at a cost of more than $2.3 million (nearly $2,000 per attendee)—amounted to a high-cost, low-turnout flop.  No budget appears to have been imposed on Bankman's sister; rather, Bankman authorized his sister "to spend whatever it takes."

81.    ***Bankman Helped Cover Up a Whistleblower Complaint***:  Far from just turning the other way, Bankman also directly participated in efforts to cover up other FTX Insiders' fraud.  As early as September 2019, he both failed to investigate and applauded others for squashing a whistleblower complaint that threatened to expose the FTX Group as a house of cards.   In September 2019, Bankman-Fried received an email from a now-deceased attorney ("Attorney-1"), threatening a lawsuit against Alameda, Alameda Ltd., FTX Trading, Bankman-Fried, and others.  Attorney-1 claimed that certain entities within the FTX Group had engaged in cryptocurrency price manipulation through pump and dump schemes, engaged in money laundering, and operated an unlicensed money transmitter business.  Whether or not these specific allegations were true, their investigation inevitably would have revealed the problems at the FTX Group.

82.    Bankman-Fried immediately forwarded the allegations to Bankman and Friedberg, and requested that Bankman participate in the response to Attorney-1.  But rather than investigate Attorney-1's claims, Bankman suggested investigating *Attorney-1*, asking "whether or not there are any disciplinary actions against [Attorney-1.]"  Within weeks, Attorney-1 filed a lawsuit on behalf of his client, which included the above claims as well as allegations that certain entities

within the FTX Group were engaged in unfair business practices and violations of the Commodity Exchange Act.

83.     Friedberg eventually  But rather than scrutinize , Bankman congratulated Friedberg for it: "You're amazing, Dan.  I hope you can take some pride in having accomplished all this."  As a tenured law professor, Bankman knew that his silence and encouragement of settlement was a breach of his fiduciary duties, as well as a breach of Friedberg's fiduciary duties.

84.     Tellingly, unlike some of the FTX Group's other executives, Bankman did not detach himself from the FTX Group after learning how haphazard its operations were.  He instead positioned himself to extract monetary and other non-monetary benefits from the FTX Group. Despite a practice of deficient recordkeeping within the FTX Group, including failing to properly record intercompany transactions and loans in business entries, Bankman's access to records and financial statements and proximity to the FTX Group's business dealings gave or should have given him insight into the businesses' insolvency.  He thus knew, or should have known, the perilous financial state of the FTX Group, even as he moonlighted as an actor in a Super Bowl commercial and extracted millions of dollars from the FTX Group.

85.     Indeed, Bankman remained intimately involved in the FTX Group until the end. On November 7, 2022, Bankman flew to The Bahamas and joined the scramble to find sources of capital to save the FTX Group.  As has been well-publicized, Bankman-Fried pursued a sale to Binance in a last-ditch effort to salvage FTX Trading, and Bankman was included in the small group that received the Binance Letter of Intent and a calendar invitation for a meeting with Binance scheduled for November 9, 2022.  On November 10, 2022, the day before the Chapter 11 filing, Bankman was scheduled to meet with The Bahamas Prime Minister.

**B.     Fried's Role in the Rise and Fall of the FTX Group**

86.     Fried is a professor emerita of Stanford Law School and joined its faculty in 1987. Fried has published more than three dozen legal and academic writings, including pieces entitled "The Limits of Personal Responsibility" and "Beyond Blame."  According to her curriculum vitae, Fried has participated in at least 65 academic presentations, including two before the American Bar Association Section of Taxation.  She currently serves as a member of the Board of Advisors of Stanford University's Ethics Center.  Fried graduated from Harvard Law School and received her bachelor's and master's degrees from Harvard University.

87.     Although she never held a formal position at the FTX Group, Fried, as with her domestic partner Bankman, was involved in aspects of the FTX Group.  Fried served as a primary advisor to Bankman-Fried and other FTX Insiders regarding political contributions, made in their individual capacities and on behalf of the FTX Group.  In sum, she presented herself as Bankman-Fried's "point person on [his] political investments[.]"

88.     As early as 2020, Fried became Bankman-Fried's "point person" for his political contribution strategy, describing herself as Bankman-Fried's "partner in crime of the noncriminal sort."  Bankman-Fried made known to several FTX Group employees his intent to rely on his

mother's direction regarding political contributions—contribution recipients, amounts, and disclosure requirements—and encouraged them to likewise follow Fried's advice.

89.     Although Fried imposed a magnanimous gloss to her efforts, she in fact used her access and influence to benefit her own organization, MTG, an independent expenditure-only political action committee that she co-founded in 2018 and for which she served as President and Chair.  According to a news report from 2020, MTG's "raison d'être is stealth," operating in a "cone of secrecy" regarding its donors and employing a "core strategy" of "hid[ing] which candidates and groups it is backing until it's too late, so to speak."  MTG relied on the FTX Group, Bankman-Fried, and Singh as sources of funding, often "dunning" Bankman-Fried or Singh for money they had previously committed, and in at least one instance, for money that Fried had committed unilaterally on Bankman-Fried's behalf.  At Fried's explicit request, Bankman-Fried and Singh contributed tens of millions of dollars to MTG or MTG-supported causes.  At times, Fried committed Bankman-Fried and Singh to backstop MTG-supported programs to ensure that MTG would meet its funding goals, and repeatedly called upon these guarantees.

90.     Fried resigned from her role at MTG after Bankman-Fried's arrest in November 2022.

## III.   BANKMAN'S AND FRIED'S MISCONDUCT COST THE DEBTORS MILLIONS OF DOLLARS

91.     Bankman and Fried wielded their influence and status as Bankman-Fried's parents to enrich themselves at the expense of the FTX Group.  Bankman caused the Debtors to make, and benefited from, the fraudulent transfer of Debtor property, breached his fiduciary duties, aided and abetted breaches of fiduciary duties, committed knowing assistance or knowing receipt, and was unjustly enriched.  Fried caused the FTX Group to make, and benefited from, the fraudulent transfer of Debtor property, aided and abetted breaches of fiduciary duties, committed knowing

assistance or knowing receipt, aided and abetted fraud, and was unjustly enriched.  Bankman and Fried deployed their decades of experience as sophisticated law professors and veneer of legitimacy not to help the FTX Group, but rather to plunder it in order to enrich themselves and their pet causes.

      **A.**      **Bankman and Fried Together Received a Gift of $10 Million Originating from an Alameda Ltd. Account Containing Customer Funds After Bankman Advised on the Transaction.**

92.     Bankman's command of tax law and unique understanding of the FTX Group's muddled corporate structure allowed him to facilitate the transfer of a cash "gift" (initially proposed by him and Fried) totaling $10 million to himself and Fried consisting of Alameda Ltd. funds.

93.     As early as October 2021, Bankman and Fried began mapping out various methods by which their son could gift them $10 million of FTX Group funds.  On October 20, 2021, Fried emailed Bankman-Fried stating: "You wrote down $14 million for the cash.  That would be right if you were giving dad $10 million in cash, but I thought you were giving him only $7.2 million in cash plus the $2.8 mill in the account in his name.  [T]he account in his name.  Which is it?"

94.     Then, in a January 2022 email exchange with Friedberg, Bankman-Fried, and others, Bankman proposed a series of possible non-taxable methods to structure a transfer of $10 million from the FTX Group to himself and Fried.  In fact, Bankman proposed that, "[t]he easiest way is to add 10M to the 250M loan Sam has from Alameda.  Then, Sam gifts the money.  No current tax on either transaction.  Eventually, Sam recognizes income when the loan is paid off *or cancelled*, at the dividend/capital gain rate, but that can happen in a year when he donates a lot, offsetting some or all of the tax."  (Emphasis added.)

95.     Heeding Bankman's advice, Friedberg agreed the $10 million gift should be papered as a loan to Bankman-Fried, and then be gifted to Bankman and Fried.  Bankman-Fried

could then transfer the "loaned" funds directly into an account belonging to Bankman and/or Fried. There is no indication that Bankman-Fried intended to repay the so-called loan, and that the transfer was papered as a loan rather than a gift demonstrates Bankman-Fried's, Bankman's, and Fried's intent to conceal the nature of the transfer, particularly given Bankman's and Fried's extensive legal experience.  Indeed, both Bankman and Fried acknowledged that the $10 million payment to them was a gift, as indicated by an email from Bankman to Bankman-Fried, stating: "*We are so touched by this gift.*  Mom is announcing retirement, which she would not have done otherwise."  (Emphasis added.)

96.    In keeping with the plan to frame the transfer as a loan to justify the use of FTX Group assets, on January 24, 2022, Bankman-Fried proposed to transfer $10 million into Bankman's FTX US exchange account, which Bankman could then withdraw and deposit into his personal bank account.  Bankman replied, "perfect!"

97.    Presumably assured by his father's endorsement of the plan, Bankman-Fried then transferred $10 million from an FTX US exchange account associated with Alameda Ltd. (info@alamedaresearch.com) directly into an FTX US exchange account associated with Bankman-Fried (sam@ftx.us).  Approximately 20 seconds later, $10 million was transferred from the same FTX US exchange account associated with Bankman-Fried (sam@ftx.us) to an FTX US exchange account associated with Bankman (jbankman@stanford.edu).  In other words, Bankman-Fried transferred $10 million from an Alameda Ltd. FTX US exchange account to Bankman.

98.    Bankman and Fried were the intended beneficiaries of, and did benefit from, the transfer.  Bankman made six withdrawals from his FTX US exchange account between January 25 and January 31, 2022, totaling $6,775,000, all of which resulted in transfers to Bankman's and Fried's joint accounts at Bank-1, Bank-2, and Bank-3.  Bankman also engaged in crypto trading

activity between January 28 and February 7, 2022 with a portion of the remaining $10 million gift in his FTX US account.  As of the Petition Date, Bankman's FTX US exchange account had a balance of $2,111,937.86 and held 9,449.095863 Solana tokens, which were valued at $152,652.07 on the Petition Date.

99.     Neither Bankman nor Fried provided Alameda Ltd. any consideration reasonably equivalent to the portion of the $10 million gift they received.  The FTX Group's activity logs on its accounting software neither reflect the $10 million transfer nor connect the transfer to either of the Defendants.

100.     As tenured law professors at one of the most highly-ranked law schools in the United States, Bankman and Fried knew that their receipt and involvement in these transfers were breaches of their son's fiduciary duties.  Nonetheless, they helped structure the transaction, encouraged it, and were eventually in receipt of it.

101.     As a direct result of this actual and constructive fraudulent transfer to Bankman and Fried, which was part of a scheme and pattern to enrich and otherwise benefit themselves, Alameda Ltd. suffered damages totaling at least $10 million.  Plaintiffs seek avoidance of the fraudulent transfer to Bankman of $10 million (which includes both the remaining balance in Bankman's FTX US exchange account and cash withdrawals of $6,775,000).[13]  Plaintiffs also seek avoidance of the fraudulent transfer to Fried of $6,775,000 of the $10 million gift, which was deposited into bank accounts jointly held by Fried and Bankman.

---

[13]   To the extent the funds remaining in Bankman's FTX US exchange account are deemed the Debtors' property, Plaintiffs seek avoidance as a fraudulent obligation.  To the extent these funds are deemed property of Bankman's, Plaintiffs seek avoidance as a fraudulent transfer.

**B.     Bankman Funded an Embed Account with Proceeds from the $10 Million Gift.**

102.    As alleged in detail in *Alameda Research Ltd. v. Giles*, No. 23-50380 (Bankr. D. Del. May 17, 2023) [D.I. 1503], another adversary proceeding filed in the Chapter 11 Cases, Bankman-Fried caused the FTX Group to grossly overpay to acquire Embed Financial Technologies Inc., a virtually worthless software platform, because the FTX Insiders hoped it would help expand FTX US's operations into conventional securities markets, thereby enriching themselves as WRS shareholders.[14]

103.    On or about August 2, 2022, Bankman transferred $115,206.46 of the $10 million gift from his FTX US exchange account into his account at Embed (the "Embed Account").  With these funds, Bankman then purchased 1,000 shares of Airbnb on the Embed Account.  As of July 2023, Bankman's Embed Account held approximately $140,000.

**C.     Bankman and Fried Received a $16.4 Million Luxury Residence in The Bahamas.**

104.    On or about February 11, 2022, Bankman and Fried signed an agreement to purchase a $16.4 million 30,000 square-foot luxury property (for the two of them) with unobstructed ocean views in the Old Fort Bay community in The Bahamas, referred to as "Blue Water" or "Old Fort Bay."  The total cash payment for Blue Water amounted to $18,914,327.82, inclusive of all costs, taxes, and fees.  Neither Bankman nor Fried contributed any money of their own towards the purchase of Blue Water; rather, all of the funds were sourced from cash provided by the Debtors.

105.    The transaction worked as follows:  On February 14 and April 14, 2022, FTX Group Bahamian affiliate FTX Digital Markets ("FTX DM")—a non-Debtor entity wholly funded

---

[14]    *See Alameda Research Ltd. v. Giles*, No. 23-50380 (Bankr. D. Del. May 17, 2023) [D.I. 1503].

by FTX Trading—executed two wire transfers totaling $18,914,327.82 directly from an account at Bank-6 as payment for Blue Water. These funds were Debtor funds that were sourced from an FTX Trading bank account with commingled customer funds. FTX DM had only two sources of cash: deposits from FTX Trading and deposits from customers of FTX Trading. FTX Trading had deposited $362 million into the FTX DM account within almost eight months before the final closing on Blue Water, $150 million of which was deposited on March 17, 2022, less than one month before FTX DM initiated its second wire transfer of more than $14.8 million towards Blue Water.

106.    Internal documents described Blue Water as an "Alameda receivable" and a property "reconveyed to/purchased for employees." But this description omits and conceals that the single FTX Group employee for whom the property was purchased was Bankman-Fried's father, along with his mother who did not work for the FTX Group. Indeed, during Bankman-Fried's criminal trial, Singh testified that "Bankman lived in one home in Old Fort Bay[.]"[15]

107.    Bankman and Fried did not hesitate to make Blue Water their own. In April 2022, Fried indicated that she was "happy to host this at *our house* at Old Fort Bay[.]" In September 2022, she emailed an FTX DM employee requesting a car service "to the airport, leaving from *our Old Fort house*[.]" (Emphasis added.) And on May 3, 2022, Bankman emailed Salame and others, stating: "We are hoping you can all come to celebrate *the house you helped us buy/move into* . . . For those who haven't been here, go to the Old Fort Bay Gate House on Bay Street . . ." (Emphasis added.) Indeed, in September 2021, approximately five months *before* Bankman and Fried closed on Blue Water, Bankman and Fried applied for permanent residency in The Bahamas, which was

---

[15]   Trial Tr. 1339:9–1339:11.

granted in October 2022.  A $15,000 fee for Bahamian permanent residency for each of them was expensed to FTX DM and ultimately paid for by FTX Trading.

108.    Bankman and/or Fried also arranged for cleaning and maintenance services at Blue Water.  Bankman even asked FTX DM employees if the company that provided landscaping services to Blue Water could "bill FTX directly."  Less than one month after closing on Blue Water, Fried instructed FTX DM employees to place online orders, including for a sofa, at least eight vases, and five rugs, one of which was a Persian hand-knotted rug costing more than $2,500, to furnish their Bahamian residence.  The furnishings were purchased with either an FTX DM corporate credit card or the personal credit card of an FTX DM employee who was reimbursed using funds that belonged to FTX Trading.

109.    Until approximately the Petition Date, Bankman and Fried received the benefit of more than $150,000 in expenses associated with Blue Water, including maintenance, cleaning services, utilities, furnishings, property assessments, and residency fees, which were paid for with funds originating from FTX Trading.[16]

---

[16]    The Debtors identified the following Blue Water-related expenses paid using FTX Trading funds:  household items for $709.77 on March 7, 2022; household items for $279.38 on March 10, 2022; furnishings for $4,371.60 on April 10, 2022; golf cart repair for $3,868.75 on April 19, 2022; electricity payment for $3,833.50 on June 14, 2022; air conditioner replacement for $61,830.18 (50% paid on June 16, 2022, and 50% paid on September 27, 2022); home repair for $470 on June 22, 2022; generator servicing for $2,145.11 on July 6, 2022; power servicing for $15,800 on August 3, 2022; cleaning services for $1,650 on August 16, 2022; lock and key replacement for $157.30 on August 26, 2022; lock and key replacement for $722.70 on August 31, 2022; home expenses for $1,386.31 on September 1, 2022; home expenses for $589.38 on September 2, 2022; generator servicing for $400 on September 14, 2022; appraisal fee for $5,500 on September 23, 2022; permanent residency fees of $15,000 each, paid on September 23, 2022; water utilities for $582.50 on September 27, 2022; pool maintenance for $14,800.63 on September 28, 2022; water utilities for $522.09 on October 6, 2022; landscaping services for $443.52 on November 4, 2022; and cable services for $612.30 on November 11, 2022.

110.    The Debtors have identified no record of either Bankman or Fried reimbursing the FTX Group for the purchase of Blue Water or any maintenance, services, furnishings, or fees associated with the property and paid for by the FTX Group.

111.    Neither Bankman nor Fried provided or agreed to provide Plaintiffs consideration reasonably equivalent to the fair market rental value of the property, services, furnishings, or fees.

112.    Bankman knew that this transaction, and his receipt of Blue Water and related paid expenses, amounted to a breach of his fiduciary duties.  Fried (and in the alternative, Bankman), knew that they were substantially participating in their son's breach of his fiduciary duties.  Both Bankman and Fried were familiar with the FTX Group's haphazard internal controls and were made aware of numerous red flags indicating that their son and other Insiders were breaching their fiduciary duties.  Yet, even as sophisticated law professors, Bankman and Fried chose to live in a multi-million dollar home in The Bahamas funded by the fly-by-night corporate organization with which they were so familiar.

113.    As a direct result of Bankman's and Fried's receipt and use of the Blue Water property and enjoyment of related benefits, including services and furnishings, Bankman and Fried were unjustly enriched at FTX Trading's expense in an amount to be determined at trial based on the fair market value of the benefits Bankman and Fried received from residing at the property.

114.    Although Bankman and Fried have purportedly transferred the property to FTX DM, a non-Debtor entity, it remains to be seen whether the Debtors will receive the full value of the property from this transfer, including to the extent the property diminished in value.  It is also unclear whether Bankman and Fried will return the various sums the Debtors expended on products and services related to the home, as detailed above.  Thus, although Bankman and Fried have apparently tried to moot this claim, there remain factual issues as to whether the Debtors will

recover or have recovered the full value improperly transferred to Bankman and Fried, which must be resolved in discovery.

### D. Bankman Directed More Than $5.5 Million in FTX Group Donations to His Employer, Stanford University.

115.    From November 2021 to May 2022, Bankman led the charge in directing FTX Group donations of more than $5.5 million to his employer, Stanford University—donations that did not benefit the FTX Group, and instead amounted to naked self-dealing by Bankman, who sought to curry favor with and enrich his employer at the FTX Group's expense.  In advancing Stanford University as a recipient of FTX Group charitable donations, Bankman also conceived of various creative means by which to remit payments to Stanford University through different FTX Group entities.

116.    In one example demonstrating Bankman's authority, Bankman directed a donation of $500,000 from FTX Trading to pass through Paper Bird.  In a November 9, 2021 email exchange, Bankman asked FTX Trading General Counsel whether Paper Bird had sufficient funds to make a $500,000 donation to Stanford University.  FTX Trading General Counsel confirmed that "there should be enough left for a $500k donation," commenting that Paper Bird had raised $303 million in the latest Series B-1 investor round.

117.    Four days later, on November 13, 2021, an FTX employee followed up with Bankman, noting that Bankman had "indicated that the funds should come from the Paper Bird entity[.]"  The FTX employee informed Bankman that Paper Bird did not have a bank account and inquired whether they should "consider sending the funds from a different entity instead[.]"  Bankman, renewing his intention to make the donation, replied: "Am I right that Paperbird has 100M plus in funds it collected from investors?  We want Paperbird to do this because it can use

the deduction.  We can have another entity loan Paperbird money but that requires some paperbird."

118.    Bankman's request was fulfilled approximately two weeks later.  On November 26, 2021, a Paper Bird account at Bank-4 was opened with a balance of zero dollars.  The Paper Bird account received two deposits from an FTX Trading account at Bank-4 in the amounts of $1 million and $500,000.  That same day, the same Paper Bird Bank-4 account initiated a wire transfer of $500,000 to Stanford University.

119.    In another example, in February 2022, Bankman shared with an FTX Foundation Project Officer—a former Alameda Research Partnership employee and Bankman-Fried's former roommate—a $4 million gift proposal to a Stanford University professor and the Stanford School of Medicine for the Fund For Pandemic Preparedness".  Bankman noted that the proposal was "pretty much of a no-brainer" but that he wanted "to run it by [the Project Officer] in this somewhat more formal way," and although "[w]e can't decide – that is against 'donor' rules . . . we can give input which, given our potential for the university, is likely to be dispositive."  A few months later, the gift was funded by a Bitcoin transfer from an Alameda Ltd. FTX.com exchange account that, because of the fluctuating price of Bitcoin at the time it was sold, was worth $4,010,579.

120.    Bankman continued to use his influence within the FTX Group to further ingratiate himself with Stanford when, in March 2022, he proposed to the FTX Foundation's CEO and Project Officer a $1.5 million gift from the FTX Foundation to Stanford University.  Bankman acknowledged that he intended to "be respectful of your approval process," but then emailed, "I propose that we get someone from the Foundation to sign it and then fund it."  Bankman soon after directed an FTX employee "to wire transfer the first 500K" of the gift to Stanford University,

which was followed by a transfer of $500,000 from Alameda Ltd.'s Bank-5 bank account to Stanford University.

121.    In July 2022, Bankman informed the General Counsel of FTX Trading that, "[w]e definitely want to contribute the 10K" to sponsor the Stanford Blockchain Conference, and, while deciding whether the donor should be the FTX Foundation or FTX US, noted that, "10K is so little it doesn't really matter, so if we think that having [FTX US] is easier or safer for some reason, we should do that."   The sponsorship was ultimately paid from an FTX US bank account after Bankman informed an FTX employee that "FTX.us is the most logical payor for this."

122.    A month after the sponsorship payment, Bankman directed another $500,000 donation to Stanford Law School, which he instructed should be made under the "[s]ame arrangements as last year."   Weeks before the FTX Group's downfall, the donation was executed from an FTX US bank account.

123.    Aware of the potential questions raised by FTX Group funds flowing to his employer, Bankman sought to distance himself publicly from at least some of those donations, noting that "it seems too close to home for me."   But internally, Bankman and his family were receiving credit from Stanford University for the FTX Group's donations.   One Stanford University employee not only described the FTX Group's donations as "all of the giving from the Bankman-Frieds," but queried with respect to the $4 million donation from Alameda Ltd. whether Stanford University "should treat that gift like the others listed (ie, *being directed by the Bankman-Fried family*)."   (Emphasis added.)

124.    The Stanford donations personally benefited Bankman by enhancing his professional and social standing with his colleagues and long-time employer, Stanford.   For that reason, the donations were inherently self-interested, regardless of whether Bankman benefited

from them financially, as he certainly benefited from them in other intangible ways, such as by bolstering his reputation and his ties to his employer and colleagues.

125.    As noted above, as a *de facto* officer, director, and/or manager of each of the Plaintiffs, Bankman owed a fiduciary duty to FTX Trading, Alameda, Alameda Ltd., and FTX US, and each of their subsidiaries and affiliates.  Bankman's repeated efforts to direct funds from the FTX Group to Stanford University constitutes a flagrant breach of those duties, as they personally benefited Bankman and effectively enriched Bankman's employer (Stanford University) at the expense of the FTX Group.

126.    As a direct result of Bankman's breaches of fiduciary duties, the FTX Group suffered damages in an amount to be proven at trial.

   **E.    Fried Encouraged Certain FTX Insiders to Make Unlawful Political Contributions to Her Own Organization and Others.**

127.    As Bankman-Fried's primary political advisor, Fried harbored concerns that public disclosure of certain of Bankman-Fried's and the FTX Group's political donations would cast a negative light.  In particular, Fried advised certain FTX Insiders against full disclosure of donations to her own organization, MTG, which would, "create the impression that funding MTG is a family affair[.]"  Fried's constant consideration of optics and how it would affect her and her son's companies, as well as how it would affect MTG's strategy of "stealth" and maintaining a "cone of secrecy,"[17] prompted Fried to pressure certain FTX Insiders to unlawfully avoid (if not violate) federal campaign finance law.

---

[17]    Theodore Schleifer, *Inside the secretive Silicon Valley group that has funneled over $20 million to Democrats*, Vox (Jan. 6, 2020), available at https://www.vox.com/recode/2020/1/6/21046631/mind-the-gap-silicon-valley-democratic-donors-stanford (last visited March 15, 2024).

128.    Fried focused heavily on masking Bankman-Fried's identity as a political donor. She regularly raised this issue in email communications with Bankman-Fried and advised him on avoidance of such disclosure.  For example, in a December 2021 email, she advised Bankman-Fried and her other son as follows: "need to start thinking through the disclosure issue now to make sure we protect [Bankman-Fried] and FTX.  Plays at the state level especially are going to provoke accusations of carpet-bagging."

129.    In an October 2020 email to the president of a political action committee regarding an anticipated $5 million contribution from Bankman-Fried, Fried asked whether Bankman-Fried would "face any potential legal or optics exposure from donating through the [Alameda] LLC?" She further noted that "[t]his is as much a judgment call as a legal one.  He's willing to take on some risk, but wants to understand what it is."

130.    As a result of her concern about public scrutiny, Fried on multiple occasions suggested, and even encouraged, Bankman-Fried and Singh to falsify disclosure records and misrepresent the source of a particular contribution.

131.    One such instance occurred in April 2021, as reflected in an email from Fried to Bankman-Fried and Singh in which she discussed Bankman-Fried's "$1 million pledge to [MTG's] operating expenses."

> *Since this is going to our 527, and hence is disclosed, I'm assuming that Nishad would be the better person to have his name on it.   We'd have a slight preference for that on our end*, now that my connection to Sam is publicly known, because we don't want to create the impression that funding MTG is a family affair, as opposed to a collective effort by many people (including some mystery guy Nishad Singh :))   If that works on your end, I'll have [an MTG employee] send you instructions.

(Emphasis added.)

41

132.    Bankman-Fried replied, "works for me on all fronts[.]" Singh replied, "[s]ounds good, I'm happy to pledge the $1m for MTG operating, *agreed on optpics* [sic].  Mind sending the wire instructions?"  (Emphasis added.)

133.    In addition, Fried emailed Bankman-Fried on August 12, 2022:

> Noah will only give in a non-disclosed form, and *I would strongly urge you to do the same-- or substitute someone else's name.*  (I'm skeptical how long that will help.  One of these days soon, some reporter is going to think to look more closely at FEC reports, do a search for donations by company, and just reframe this as the FTX juggernaut rather than the SBF juggernaut, or even worse suggest you are using Nishad/Caroline as fronts.).  Nondisclosed form would mean to the 501(c)(4).

(Emphasis added.)  Bankman-Fried responded: "Awesome!  Yup happy to split the $15m with him wherever it's best."  Fried replied, "[y]ou are a prince."

134.    Further, in an August 19, 2022 email to Bankman-Fried discussing funding gaps for political entities associated with a particular organization, Fried presented Bankman-Fried with disclosure "options:"

> *I would counsel strongly against giving in a disclosed form under your own name*, both for MTG's sake and yours.  (Of course the obvious and truthful answer to why you are giving the money-- to defeat state legislators who are committed to subverting the will of the voters— won't get you very far with the press and won't get you anywhere with Republicans.)  *You could get Nishad or Caroline to contribute to the PAC some of the total amount you are willing to give*, but that has its own costs and risks.

(Emphases added).  In response, Bankman-Fried indicated that he "agreed that it doesn't make sense for me to give disclosed" and that "it makes sense for me to give another $2m or so for it (in whichever way makes most sense etc.)[.]"

135.    Singh served as a conduit through which FTX Group funds passed to recipients hand-selected by Fried and rubber-stamped by Bankman-Fried.  Singh enthusiastically agreed to make political contributions, which were funded by FTX Group funds.  Indeed, Singh testified at Bankman-Fried's criminal trial that "[t]here were political donations made in my name, using my

bank account, so these did literally go through my bank account, the funds deposited straight from Alameda."[18]  He described that, for some political contributions, "[f]unds would start out with Alameda at some bank account.  They would get transferred into – wired to my Prime Trust account . . . and then [Salame] would request a wire withdrawal from my bank account to the campaign as a destination, and I would click OK in my email."[19]  Singh understood that the donations were made in his name "[f]or advantageous optics [because] it was useful for my name to be associated with some donations, even if the end recipient understood that they were really coming from someone else."[20]

136.   Within two years of the Petition Date, there were at least three off-exchange cash transfers from the FTX Group to Singh that funded a political contribution:

    a.   On April 12, 2021, Alameda transferred $1 million from its account at Bank-5 into Singh's Bank-4 bank account.  On April 13, 2021, Singh transferred $1 million from his Bank-4 account to MTG, Fried's own organization.  This $1 million may have come from customer funds.[21]

    b.   On July 15, 2022, Alameda Ltd. transferred $2 million from its account at Bank-5 into Singh's Bank-4 bank account.  That same day, Singh contributed $1 million from his Bank-4 account to Senate Majority PAC.

---

[18]   Trial Tr. 1420:19–21.

[19]   Trial Tr. 1430:3–7.

[20]   Trial Tr. 1434:10–12.

[21]   With respect to this particular $1 million, the Government's expert witness at Bankman-Fried's criminal trial testified that, "in the immediate vicinity of that transfer of a million, there was 1.5 billion of customer funds that were transferred into Alameda Research, 4456, and roughly half a billion of other inflows.  So this is a case where we cannot directly trace the money to customer funds, but it seems likely -- I'm purely looking at the numbers here -- it seems likely, given that we have got roughly two billion of customer funds and half a billion of other inflows, that it may have come from customer funds."  Trial Tr. 1748:15–24.

c.  On July 18, 2022, Alameda Ltd. transferred $5 million from its account at Bank-5 into Singh's Bank-4 account.  The following day, Singh donated from his Bank-4 account $1.5 million to EMILY's List, and in the following weeks, donated $750,000 to Women Vote! and $100,000 each to the House Legislative Campaign Fund and Maine Democratic State Committee.  On August 22, 2022, Singh transferred $2 million to an organization that supported a ballot initiative in Michigan.

137.    Singh admitted to having conspired to commit campaign finance law violations, pleading guilty to conspiracy to defraud the United States and willfully violate the Federal Election Campaign Act, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30109, 30118, and 30122.  These statutes, among other things, prohibit the making of a contribution in the name of another person or knowingly permitting his or her name to be used to effect such a contribution, and knowingly accepting a contribution made by one person in the name of another.[22]  During his plea allocution, Singh admitted that in 2022, he "agreed with others at FTX and Alameda to make political donations in [his] name that were funded in part by transfers from Alameda" and that, "although [he] agreed politically with many of the donations, [he] did not select the candidates and the political action committees who received the donations."  Singh further admitted that he "knew at that time that Alameda money had to be coming, effectively, from FTX customer funds."

138.    Fried knew that at the time of Singh's $1 million contribution to MTG that Alameda was funding the contribution to her own organization, as she proposed and encouraged that Singh

---

[22]  *See* Superseding Information, *United States v. Singh*, No. 22-cr-00673 (S.D.N.Y. Feb. 28, 2023), ECF No. 90.

"have his name on it" for optical reasons and coordinated sending Singh wire instructions to facilitate the straw donation.

139.    She also knew (particularly as a law professor and the founder and CEO of a non-profit organization herself) that Singh's conduct in the straw donor scheme (including agreeing to act as an intermediary, accepting the funds from Alameda, authorizing the wire transfer to MTG, failing to inform Alameda management that the contribution was made with Alameda funds, failing to advise Alameda that it needed to disclose the contribution, and representing that he was the actual donor) violated campaign finance laws and constituted a breach of his fiduciary duties to Alameda as Alameda's Head of Engineering.

140.    Fried was also aware that the FTX Group had previously contributed to MTG's pet projects and had reason to believe that it would continue to do so.  For example, in an ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████  And in an October 2020 email discussing political contributions and "Sam's LLC," Fried noted, "I don't know exactly what interconnected entity he sent the money from . . . but the business is real and revenue-generating.  And a corporation."  In addition, in September 2021, a nonprofit organization formed under Section 527 of the Internal Revenue Code requested from MTG a "confirmation email direct from the true source of the funds" for a $22,000 contribution made by Bankman-Fried.  Fried forwarded the request to Bankman-Fried asking, "[d]id the $22,000 come from you as an individual contributor or as a contribution from FTX.US?"

141.    Fried knowingly aided and abetted Singh's breaches of fiduciary duties in connection with Singh's $1 million contribution to MTG in April 2021 originating from Alameda.

142.    Fried's actions, which led to the failure to disclose Alameda as the actual source of funds for political contributions, harmed Alameda in an amount to be proved at trial.

## IV.    THE DEBTORS WERE INSOLVENT AT ALL RELEVANT TIMES AND THE FTX INSIDERS ENGAGED IN NUMEROUS ACTIVITIES TO HINDER, DELAY, AND DEFRAUD CREDITORS

143.    As shown above, at all relevant times, the FTX Group was insolvent, and the more insolvent it became, the more Bankman and Fried extracted value from it, even as its collapse grew more and more inevitable.

144.    As alleged in Bankman-Fried's criminal indictment: "From at least in or about 2019, up to and including in or about November 2022," Bankman-Fried "corrupted the operations of the cryptocurrency companies he founded and controlled . . . through a pattern of fraudulent schemes . . ."[23]

145.    The FTX Insiders failed to implement virtually any of the systems or controls necessary for companies entrusted with customer money or other assets.  The FTX Insiders concealed the FTX Group's failing and insolvent state by raiding and misappropriating billions of dollars in cash, cryptocurrency, and other assets from customer accounts.  The FTX Insiders and FTX Group senior management accomplished this through multiple deceptions, including lying to customers about the segregation and safety of their accounts, and creating a series of secret mechanisms by which assets could be transferred within the FTX Group's capital structure and, ultimately, out of the FTX Group's custody.  As alleged in Superseding Indictments, Bankman-Fried's "multi-billion-dollar fraud" was executed "through a series of systems and schemes that

---

[23]   *See* Third Superseding Indictment ¶ 1, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Aug. 14, 2023), ECF No. 202.

allowed" Bankman-Fried and other FTX Insiders "to access and steal FTX customer deposits without detection."[24]

146.    From the beginning of the FTX.com exchange, funds that customers intended to be deposited on the exchange in fact were deposited with Alameda Ltd. or North Dimension.  At the same time, although the FTX Group's exchange software generally did not allow for an account on the exchange to carry a negative balance, in or around July 2019, Bankman-Fried directed one or more of his co-conspirators or individuals working at their behest to modify the exchange software to permit Alameda Ltd. to maintain a negative balance in its account on the exchange, including modifying settings in the exchange software known as "borrow," "can_withdraw_below_borrow," and "allow_negative."

147.    Through these cheats, Alameda Ltd. was not only able to evade collateralizing its position on the exchange; Alameda Ltd. also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it a virtually unlimited "line of credit" collateralized by the customer deposits on the exchange.  As of the commencement of the Chapter 11 Cases, the exchange's software had been tampered with to an extent sufficient to expand Alameda Ltd.'s "line of credit" to $65 billion.  Alameda Ltd. lacked any ability to repay this line of credit, having spent the money on Insider transfers and purported loans, gifts, and questionable investments.

148.    Nor was the FTX Insiders' insatiable need for funds limited to propping up the FTX Group in the face of extreme risk and management failures.  Bankman-Fried and other FTX Insiders needed funds to pay for billions of dollars in ill-conceived and outright fraudulent

---

[24]    *See* First Superseding Indictment ¶ 4, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

transfers.  The FTX Group's improper outflows and expenditures are staggering.  Billions of dollars were spent on purported loans, gifts, and other transfers to Bankman-Fried, other senior management, their friends and families, political contributions, and "investments" made with little or no apparent due diligence.

149.    Rather than rein in this misappropriation, Bankman began planning for the FTX Group to take advantage of bankruptcy structuring months after the FTX Group had incurred significant liabilities, including loans to FTX Insiders.

150.    The FTX Insiders' misappropriation of customer funds rendered the FTX Group insolvent at all relevant times.  On November 2, 2023, having heard evidence of staggering embezzlement of billions of dollars of customer funds, a jury found Bankman-Fried guilty on all counts.[25]  However, without even accounting for the distorting effects of Bankman-Fried's staggering fraud, at all relevant times the FTX Group's liabilities far exceeded the fair value of their assets, and the FTX Group lacked sufficient cash, cryptocurrency, and other assets to cover customer accounts and their creditors' claims.  Certain FTX Insiders continued to operate the FTX Group only by continually concealing and lying to customers and other creditors about their financial condition and misuse of customer funds.

151.    Alameda Ltd. and FTX US were both insolvent when the $10 million was transferred into Bankman's FTX US exchange account in the first quarter of 2022 and when those funds were withdrawn from Bankman's FTX US exchange account into accounts held jointly by Bankman and Fried in the months thereafter.

152.    Alameda Ltd.'s liabilities were enormous, and from at least early 2022 until the Petition Date, their value far exceeded the value of Alameda Ltd.'s assets.  As detailed herein, in

---

[25]   Trial Tr. 3252:3–3254:24.

or around July 2019, Bankman-Fried directed one or more of his co-conspirators and individuals working at their behest to modify the exchange software to permit Alameda Ltd. to maintain a negative balance in its account on the FTX exchange. This gave Alameda Ltd. a virtually unlimited "line of credit" to borrow customer deposits on the exchange. By the first quarter of 2022, Alameda Ltd. had abused this borrowing power to extract immense resources from customers, and owed substantial sums to various third parties from which it had taken loans.

153.   By contrast, by the first quarter of 2022, Alameda Ltd.'s assets were smaller and overconcentrated in speculative crypto assets and strategies. In some instances, it was unclear whether Alameda Ltd.'s crypto assets could be liquidated for value. For example, Alameda Ltd. was heavily invested in a token called Serum ("SRM"). Almost all of the SRM tokens in circulation, however, were held by Bankman-Fried and other FTX Insiders. Consequently, any large market-based sale of SRM tokens would have resulted in their market price falling substantially.

154.   In addition to being balance sheet insolvent, Alameda Ltd. was also inadequately capitalized. Given the nature of its business and balance sheet, Alameda Ltd. required a large capital cushion in order to ensure that it could make loan repayments and meet margin and collateral calls if asset values were to drop. In particular, Alameda Ltd. owed substantial crypto assets to third parties on loan contracts, some of which were "open term" and could be called on demand, and others of which had variable collateral requirements. Alameda Ltd. had nowhere near sufficient capital to reasonably protect against such risks.

155.   Like Alameda Ltd., FTX US was also insolvent during the first quarter of 2022. It owed customers on the FTX.US exchange more in assets than it actually owned. FTX US was

also inadequately capitalized, and therefore it was constantly at risk of being unable to satisfy customer withdrawals.

156.     FTX Trading was insolvent on the dates that FTX Trading made payments towards Blue Water in February and April 2022.   On both dates, FTX Trading owed customers on the FTX.com exchange more than the digital assets it had to pay those customers.   As was the case for the FTX.US exchange, the assets FTX Trading owned were mismatched as compared to its customer liabilities, in large part because of transfers from FTX Trading to Alameda Ltd.   For instance, FTX.com owed customers far more in fiat and stablecoins than FTX Trading owned in fiat and stablecoins.   This increased the need for a sizable equity tranche to allow FTX Trading to be adequately capitalized.   It lacked any such equity tranche; in fact, FTX Trading was already balance sheet insolvent.

## V.     THE DEBTORS FILE FOR BANKRUPTCY AND CERTAIN FTX INSIDERS ADMIT TO WRONGDOING

157.     In the early hours of November 11, 2022, Bankman-Fried signed a document turning over control of the FTX Group to John J. Ray III.   Bankman's resignation became effective on or around the same day.

158.     On November 11 and 14, 2022, the Debtors filed for Chapter 11 bankruptcy, commencing the Chapter 11 Cases.

159.     Guilty pleas entered by certain FTX Insiders have confirmed that they and other FTX Insiders engaged in a fraudulent scheme and other criminal acts in their operation of the FTX Group.   Wang, Ellison, Singh, and Salame all entered guilty pleas.   On December 18, 2022, Wang pleaded guilty to wire fraud and aiding and abetting the same, conspiracy to commit wire

fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.[26]  The

same day, Ellison pleaded guilty to two counts of wire fraud and aiding and abetting the same, two

counts of conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy

to commit securities fraud, and conspiracy to commit money laundering.[27]  On February 26, 2023,

Singh pleaded guilty to wire fraud and aiding and abetting the same, and five conspiracy charges,

including conspiracy to commit securities fraud, conspiracy to commit money laundering, and

conspiracy to violate federal campaign finance laws.[28]  On September 7, 2023, Salame pleaded

guilty to conspiracy to make unlawful political contributions and defraud the Federal Election

Commission and conspiracy to operate an unlicensed money transmitting business.[29]

     160.    The Securities and Exchange Commission charged Wang and Ellison in a parallel

proceeding, alleging, among other things, that they manipulated the price of FTT, an FTX.com-

issued exchange crypto security token.[30]  Ellison and Wang entered into consent orders with the

Commodity Futures Trading Commission ("CFTC") as to their liability for engaging in fraud in

violation of Section 6(c)(1) of the Commodity Exchange Act and CFTC Regulation 180.1.[31]

     161.    On December 9, 2022, a grand jury sitting in the United States District Court for

the Southern District of New York indicted Bankman-Fried, charging him with two counts of wire

fraud, as well as four counts of conspiracy to commit wire, securities, and commodities fraud,

---

[26]   Wang Plea Agreement, *United States v. Wang*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022).

[27]   Ellison Plea Agreement, *United States v. Ellison*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022).

[28]   Singh Plea Agreement, *United States v. Singh*, No. 22-cr-00673 (S.D.N.Y. Feb. 28, 2023).

[29]   Salame Plea Agreement, *United States v. Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 7, 2023).

[30]   *Securities and Exchange Commission v. Ellison and Wang*, No. 1:22-cv-10794 (S.D.N.Y. Dec. 21, 2022).

[31]   *Commodity Futures Trading Commission v. Bankman-Fried, Ellison, & Wang*, Case No. 1:22-cv-10503-PKC (S.D.N.Y. Dec. 21, 2022).

conspiracy to commit money laundering, and conspiracy to defraud the United States and violate campaign finance laws.[32]

162.    As alleged in a Third Superseding Indictment, returned on August 14, 2023, Bankman-Fried conspired to and actually did commit wire fraud, and conspired to commit securities fraud, commodities fraud, and money laundering.[33]   On November 2, 2023, a jury returned a verdict finding Bankman-Fried guilty on all seven counts.

<u>**CAUSES OF ACTION**</u>

<u>**COUNT I**</u>
<u>**Breaches of Fiduciary Duties Under Delaware Law**</u>
**(against Defendant Bankman)**

163.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 162 of the First Amended Complaint as though the same were set forth in full herein.

164.    Bankman owed fiduciary duties of care, loyalty, good faith, and fair dealing and oversight to Alameda and FTX US, as a *de facto* officer, director, and/or manager of each entity.

165.    Bankman breached his fiduciary duties by, among other things:

a.    Diverting funds from Alameda and FTX US for his own personal benefit, as well as Fried's benefit;

b.    Directing self-interested donations to his employer, Stanford University, which imparted minimal, if any, benefit onto the Debtors, but benefitted Bankman and Fried personally by enhancing their professional and social status with their colleagues and long-time employer;

---

[32]    *See* Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Dec. 9, 2022), ECF No. 1.  The Government withdrew its charge of conspiracy to defraud the United States and violate campaign finance laws.

[33]    *See* Third Superseding Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Aug. 14, 2023), ECF No. 202.

c.  Failing to investigate and encouraging the cover-up of a whistleblower complaint alleging fraud within Alameda and other FTX Group entities;

d.  Failing to exercise any meaningful oversight over the affairs of Alameda and FTX US;

e.  Abusing or allowing abuse of positions of authority within Alameda and FTX US for Bankman's and Fried's personal gain and to the detriment of Alameda and FTX US; and

f.  Acting with gross negligence or greater than gross negligence by being recklessly uninformed or acting outside the bounds of reason.

166.   Upon information and belief, Bankman acted with scienter and his misconduct was an intentional and/or knowing violation of the law.  Bankman's conduct cannot be attributed to any rational business purpose for the benefit of the Debtors, and he knew or recklessly disregarded the fact that he was acting in a way that was adverse to the interests of Alameda and FTX US and Alameda's and FTX US's unsecured creditors.

167.   Bankman, in carrying out his functions as a *de facto* officer, director, and/or manager of Alameda and FTX US, did not exercise the care, diligence, and skill that a reasonable officer, director, and/or manager would exercise in similar circumstances.

168.   Bankman, in breaching his fiduciary duties of care, loyalty, good faith, and fair dealing and oversight, showed a conscious disregard for the best interests of Alameda and FTX US, and their creditors.

169.   As a direct and proximate result of Bankman's breaches of fiduciary duties, Alameda and FTX US suffered loss and damage in an amount to be determined at trial.

## COUNT II
### Breach of Fiduciary Duties Under British Virgin Islands Law
### (against Defendant Bankman)

170.   Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 162 of the First Amended Complaint as though the same were set forth in full herein.

171.   Due to his role as a *de facto* director, having acted as, and carried out the functions of a director, notwithstanding the fact that his appointment as a director did not follow corporate formalities, and he had not been formally appointed as such, under British Virgin Islands law, Bankman owed fiduciary duties to Alameda Ltd.

172.   Bankman breached his fiduciary duties by, among other things:

  a.   Diverting funds from Alameda Ltd. for his own personal benefit, as well as Fried's benefit;

  b.   Encouraging or otherwise facilitating the transfer of a $10 million "gift" from Alameda Ltd. ultimately to himself for the personal benefit of himself and Fried;

  c.   Directing self-interested donations to his employer, Stanford University, which imparted minimal, if any, benefit onto the Debtors, but benefitted Bankman and Fried personally by enhancing their professional and social status with their colleagues and long-time employer;

  d.   Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

  e.   Failing to investigate and encouraging the cover-up of a whistleblower complaint alleging fraud within Alameda Ltd. and other FTX Group entities;

f.   Failing to exercise any meaningful oversight over the affairs of Alameda Ltd.; and

g.   Abusing or allowing abuse of positions of authority within Alameda Ltd. for Bankman's and Fried's personal gain and to the detriment of Alameda Ltd.

173.   Upon information and belief, Bankman acted with scienter and his misconduct was an intentional and/or knowing violation of the law.  Bankman's conduct cannot be attributed to any rational business purpose for the benefit of the Debtor, and he knew or recklessly disregarded the fact that he was acting in a way that was adverse to the interests of Alameda Ltd. and Alameda Ltd.'s unsecured creditors.

174.   Bankman, in carrying out his functions as a *de facto* director of Alameda Ltd., did not exercise the care, diligence, and skill that a reasonable director would exercise in similar circumstances.

175.   Bankman, in breaching his fiduciary duties—including the duties to act honestly and in good faith, to act in the best interests of the company, to act for a proper purpose, to avoid conflicts of interest, and to act with skill and care—showed a conscious disregard for the best interests of Alameda Ltd. and its creditors.

176.   As a direct and proximate result of Bankman's breaches of fiduciary duties, Alameda Ltd. suffered loss and damage in an amount to be determined at trial.

## COUNT III
## Breach of Fiduciary Duties Under Antigua Law
### (against Defendant Bankman)

177.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1
through 162 of the First Amended Complaint as though the same were set forth in full herein.

178.    Bankman was a *de facto* officer and/or director of FTX Trading, as he was
appointed by Bankman-Fried as such, was a part of the governing structure of FTX Trading,
undertook functions in relation to FTX Trading which could properly be discharged only by an
officer or director, was held out by FTX Trading as an officer and/or director, assumed the
responsibilities and discharged the powers and functions of an officer and/or director, and
purported to be an officer and/or director.

179.    Due to his role as a *de facto* officer and/or director of FTX Trading, Bankman owed
fiduciary duties to FTX Trading.

180.    Bankman breached his fiduciary duties by, among other things:

    a.   Diverting funds from FTX Trading for his own personal benefit, as well as
Fried's benefit;

    b.   Authorizing unlawful transfers knowing the same were unlawful;

    c.   Directing self-interested donations to his employer, Stanford University, which
imparted minimal, if any, benefit onto the Debtors, but benefitted Bankman and
Fried personally by enhancing their professional and social status with their
colleagues and long-time employer;

    d.   Failing to implement or cause to be implemented internal controls that would
have prevented the wrongdoing alleged herein;

e.  Failing to investigate and encouraging the cover-up of a whistleblower complaint alleging fraud within FTX Trading and other FTX Group entities;

f.  Failing to exercise any meaningful oversight over the affairs of FTX Trading; and

g.  Abusing or allowing abuse of positions of authority within FTX Trading for Bankman's and Fried's personal gain and to the detriment of FTX Trading.

181.    Upon information and belief, Bankman acted with scienter and his misconduct was an intentional and/or knowing violation of the law.  Bankman's conduct cannot be attributed to any rational business purpose for the benefit of the Debtor, and he knew or recklessly disregarded the fact that he was acting in a way that was adverse to the interests of FTX Trading and FTX Trading's unsecured creditors.

182.    Bankman, in carrying out his functions as a *de facto* officer and/or director of FTX Trading did not exercise the care, diligence, and skill that a reasonable officer or director would exercise in similar circumstances.

183.    Bankman, in breaching his fiduciary duties as described herein, showed a conscious disregard for the best interests of FTX Trading.

184.    As a direct and proximate result of Bankman's breaches of fiduciary duties, FTX Trading suffered loss and damage in an amount to be determined at trial.

### COUNT IV
### Aiding and Abetting Breaches of Fiduciary Duties Under Delaware Law
### (against Defendant Bankman)

185.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 162 of the First Amended Complaint as though the same were set forth in full herein.

186.    In the event the Court concludes that Bankman did not owe any fiduciary duty to Alameda and/or FTX US, Bankman participated in and aided and abetted Bankman-Fried's and

Friedberg's breaches of their fiduciary duties to Alameda and FTX US, which include, among other things:

    a.   Authorizing the transfer of Alameda and FTX US funds to Stanford University;

    b.   Facilitating, authorizing, participating in, or failing to prevent a self-interested transaction;

    c.   Diverting funds from Alameda and/or FTX US for Bankman's personal benefit, as well as Fried's benefit, which imparted minimal, if any, benefit onto the Debtors;

    d.   Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

    e.   Failing to investigate and encouraging the cover-up of a whistleblower complaint alleging fraud within Alameda and other FTX Group entities;

    f.   Failing to exercise any meaningful oversight over the affairs of Alameda and/or FTX US;

    g.   Abusing or allowing abuse of positions of authority within Alameda and/or FTX US for Bankman's and Fried's personal gain and to the detriment of Alameda and/or FTX US;

    h.   Failing to use the amount of care that an ordinarily careful and prudent person would use in similar circumstances;

    i.   Failing to consider all material information reasonably available;

    j.   Acting with gross negligence, either by being recklessly uninformed, or acting outside the bounds of reason; and

    k.   Engaging in intentional dereliction of duties.

187.     Bankman knowingly participated in and aided and abetted Bankman-Fried's and Friedberg's breaches of their respective fiduciary duties to Alameda and FTX US by, among other things:

    a.   Encouraging, directing, and orchestrating the transfer of Alameda and FTX US funds to Stanford University;

    b.   Failing to investigate and encouraging the cover-up of a whistleblower complaint alleging fraud within Alameda and other FTX Group entities; and

    c.   Knowingly encouraging, directing, and advising Bankman-Fried to facilitate, direct, or execute a transaction that improperly benefited Bankman.

188.     Bankman-Fried and Friedberg, in carrying out their functions as officers, directors, and/or managers of Alameda and/or FTX US, did not exercise the care, diligence, and skill that a reasonable officer, director, and/or manager would exercise in similar circumstances, and instead acted with gross negligence or greater than gross negligence by being recklessly uninformed or acting outside the bounds of reason.

189.     As a tenured law school professor, Bankman knew that Bankman-Fried's and Friedberg's conduct constituted a breach of their respective fiduciary duties.

190.     As a direct and proximate result of the foregoing, Alameda and FTX US were damaged in an amount to be determined at trial.

## COUNT V
### Aiding and Abetting Breaches of Fiduciary Duties Under Delaware Law
### (against Defendant Fried)

191.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 162 of the First Amended Complaint as though the same were set forth in full herein.

192.    Singh, Alameda's Head of Engineering, breached his fiduciary duties, including the duties of care, loyalty, and good faith, to Alameda by, among other things:

    a.  Concealing that Alameda was the original source of $1 million that Singh transferred to MTG on April 13, 2021, in potential violation of campaign finance laws;

    b.  Facilitating, authorizing, participating in, or failing to prevent a conduit contribution from Alameda, through Singh, ultimately to MTG;

    c.  Facilitating, authorizing, participating in, or failing to prevent Alameda's potentially unlawful failure to disclose that it was the original source of contributions to MTG;

    d.  Failing to use the amount of care that an ordinarily careful and prudent person would use in similar circumstances;

    e.  Failing to consider all material information reasonably available;

    f.  Acting with gross negligence, either by being recklessly uninformed about campaign finance laws, or acting outside the bounds of reason by intentionally causing Alameda to potentially violate such laws;

    g.  Receiving a personal benefit, including public recognition as a donor, that Alameda did not enjoy; and

h. Engaging in intentional dereliction of duties by facilitating, authorizing, participating in, or failing to prevent the transfer of Alameda funds to Singh to reimburse or advance his contribution to MTG.

193. Fried knowingly participated in and aided and abetted Singh's breach of his fiduciary duties to Alameda by, among other things:

a. Advising and encouraging Singh to evade political contribution disclosure rules by engaging in a straw donation scheme;

b. Advising and encouraging Singh to authorize the release of Alameda funds to his bank account to reimburse or advance his contribution to MTG, at Fried's guidance and/or direction; and

c. Encouraging Singh to commit federal campaign finance law violations despite Fried's actual or constructive knowledge that adhering to such advice would cause Singh to engage in unlawful activity and breach his fiduciary duties to Alameda.

194. As a direct and proximate result of the foregoing, Alameda was damaged in an amount to be determined at trial.

## <u>COUNT VI</u>
### <u>Knowing Assistance or Knowing Receipt Under Antigua Law</u>
**(against Defendants Bankman and Fried)**

195. Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 162 of the First Amended Complaint as though the same were set forth in full herein.

196. Fried, and, in the event the Court concludes that Bankman did not owe any fiduciary duty to FTX Trading, Bankman knowingly assisted and participated in Bankman-Fried's breaches of his fiduciary duties to FTX Trading, which include:

    a.   Authorizing the transfer of FTX Trading funds to Stanford University;

    b.   Facilitating the purchase of Blue Water for the benefit of his parents, who provided no consideration in return;

    c.   Authorizing payment of, with FTX Trading funds, expenses related to Blue Water and his parents' residency in The Bahamas;

    d.   Allowing FTX Trading to incur expenses related to Blue Water, which imparted no benefit on FTX Trading or any FTX Group entity, but instead served to benefit (and did benefit) his parents; and

    e.   Failing to investigate and encouraging the cover-up of a whistleblower complaint alleging fraud within FTX Trading and other FTX Group entities.

197.    Bankman knowingly assisted and/or knowingly participated in Bankman-Fried's breaches of his fiduciary duties by, among other things:

    a.   Encouraging, directing, and orchestrating the transfer of FTX Trading funds to Stanford University;

    b.   Signing an agreement to purchase a $16.4 million luxury property knowing that the funds used to purchase the property would be sourced from the FTX Group;

    c.   Expensing to FTX DM more than $150,000 in expenses associated with Blue Water, including maintenance, cleaning services, utilities, furnishings, property assessments, and residency fees, which were paid for with funds originating from FTX Trading;

    d.   Encouraging and advising on the cover-up of a whistleblower complaint alleging fraud within FTX Trading and other FTX Group entities; and

    e.   Directing self-interested donations to Bankman's employer, Stanford University, which imparted minimal, if any, benefit onto the Debtors, but benefitted Bankman and Fried personally due to their status as tenured professors at Stanford Law School.

198.    Fried knowingly assisted and/or knowingly participated in Bankman-Fried's breaches of his fiduciary duties to FTX Trading by, among other things:

    a.   Signing an agreement to purchase a $16.4 million luxury property knowing that the funds used to purchase the property would be sourced from the FTX Group;

    b.   Expensing to FTX DM more than $150,000 in expenses associated with Blue Water, including maintenance, cleaning services, utilities, furnishings, property assessments, and residency fees, which were paid for with funds originating from FTX Trading.

199.    As a direct and proximate result of the foregoing, FTX Trading suffered loss and damage in an amount to be determined at trial.

## COUNT VII
## Aiding and Abetting Fraud
### (against Defendant Fried)

200.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 162 of the First Amended Complaint as though the same were set forth in full herein.

201.    Singh committed fraud, as shown by, among other things:

    a.   Singh represented that his $1 million contribution to MTG on April 13, 2021 was made on his own behalf, despite his acting as a conduit of funds originating from Alameda;

    b.   Singh knew that this representation was false and/or acted with reckless indifference to their truth or falsity;

    c.   Singh deliberately failed to reveal material information he was obligated to reveal, namely that he had made a straw contribution and that the source of the funds was Alameda;

    d.   Alameda relied upon Singh's false statements and/or deliberate omission of material information when making, or failing to make, required representations to third parties, including governmental bodies, about Alameda's political contribution activities and history; and

    e.   Singh intended to conceal the true purpose of the funds and induce reliance on the apparent legality of the transactions.

202.    Fried knew of the underlying tortious conduct, through her extensive correspondence with Singh and Bankman-Fried about the same.

203.    Fried substantially assisted the fraud by, among other things, giving advice to Singh, actively encouraging Singh to include misstatements on disclosure documents, and coordinating the provision of wire instructions to Singh.

204.    As a direct and proximate result of Fried's aiding and abetting the fraud committed by Singh, Alameda suffered loss and damage in an amount to be determined at trial.

**<u>COUNT VIII</u>**
**<u>Unjust Enrichment</u>**
**(against Defendants Bankman and Fried)**

205.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 162 of the First Amended Complaint as though the same were set forth in full herein.

206.    FTX Trading paid $18,914,327.82, inclusive of taxes, fees, and costs, for Blue Water, to which Bankman and Fried received title, as well as various expenses related to Blue Water totaling more than $150,000.  In the event the Court concludes that the transfers of such property were not actual or constructive fraudulent transfers, FTX Trading seeks recovery under a theory of unjust enrichment.

207.    FTX Trading and Defendants did not have any contractual arrangement providing for the transfer of the property and associated expenses, and Defendants did not provide consideration in exchange for either.

208.    The purchase of Blue Water for Defendants with FTX Trading funds and payment for associated expenses had no justification and served no business purpose.  FTX Trading received no or little consideration in exchange.

209.    Defendants have wrongfully possessed and exercised control or dominion over Blue Water and furnishings contained therein, which rightfully belong to Plaintiffs, and have been enriched in an amount equal to the fair market value of having enjoyed those benefits, as well as other benefits related to services and fees incurred in connection with Blue Water.

210.    Defendants have not filed any accounting to account for or pay to FTX Trading the value of the benefits Defendants incurred from their use of the property, related services, furnishings, and fees, plus interest, and the profits derived therefrom.

211.    Bankman received a $10 million gift consisting of Alameda Ltd. funds.  Bankman withdrew $6,775,000 of those funds from his FTX US exchange account to bank accounts held jointly by Bankman and Fried.  In the event the Court concludes that the transfers of such property were not actual or constructive fraudulent transfers, Alameda Ltd. seeks recovery under a theory of unjust enrichment.

212.    Alameda Ltd. and Defendants did not have any contractual arrangement providing for the transfer of these funds, and Defendants did not provide consideration in exchange for the amounts gifted to them.

213.    Defendants have wrongfully possessed and exercised control or dominion over the gift, which rightfully belongs to Alameda Ltd.

214.    The transfer of Alameda Ltd. funds to Defendants ($10 million to Bankman and $6,775,000 to Fried) had no justification and served no business purpose.  Alameda Ltd. received no consideration in exchange.

215.    As a direct and proximate result of the transfers, Defendants have been unjustly enriched to the detriment and at the expense of Alameda Ltd. and FTX Trading, as they have failed to remit to Alameda Ltd. or FTX Trading any repayment for the transfers.

216.    The unjust enrichment of Defendants was inequitable and in violation of fundamental principles of justice, equity, and good conscience.

217.    Accordingly, Alameda Ltd. and FTX Trading are entitled to restitution.

218.    Alameda Ltd. and FTX Trading demand restitution and judgment against Bankman in an amount of at least $10 million; against Fried in an amount of at least $6,775,000; and, additionally, against Bankman and Fried in an amount to be determined at trial, calculated by the fair market value of enjoying the benefits of Blue Water and associated expenses; together with interest, attorneys' fees, and the costs of this action, and other and further relief as the Court deems just and proper.

## COUNT IX
## Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550
### (against Defendants Bankman and Fried)

219.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 162 of the First Amended Complaint as though the same were set forth in full herein.

220.    Bankman and Fried received title to Blue Water, as well as various benefits from expenses incurred by FTX Trading related to Blue Water.

221.    Bankman received a $10 million gift consisting of Alameda Ltd. funds, of which $6,775,000 was withdrawn from his FTX US exchange account to bank accounts held jointly by Bankman and Fried.  Bankman-Fried acted as a mere conduit, or, in the alternative, Bankman and Fried were subsequent transferees after the initial transfer of funds from Alameda Ltd. to Bankman-Fried, and Bankman and Fried lacked good faith with respect to such transfers.

222.    The transfers were of property of Plaintiffs FTX Trading and Alameda Ltd.

223.    The transfers were made within two years before the Petition Date.

224.    The transfers were made with the actual intent to hinder, delay, or defraud present or future creditors of Debtors.

225.    Multiple badges of fraud permeate the aforementioned transfers, including that:

    a.    The transfers were made to close family members of Bankman-Fried with the knowledge of and/or at the direction of Bankman-Fried;

    b.    The transfers were part of a scheme to enrich and otherwise benefit Bankman and Fried;

    c.    The transfers were made to insiders of FTX Trading and Alameda Ltd., which both Bankman and Fried were under 11 U.S.C. 101(31)(B)(vi);

    d.    Material facts relating to the transfers were concealed;

e.  The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred; indeed, Bankman and Fried provided no consideration to the Plaintiffs for the transfers; and

f.  The transfers occurred shortly before or shortly after Plaintiffs incurred substantial debts.

226.  FTX Trading and Alameda Ltd. (a) were insolvent on the date of the transfers, (b) became insolvent as a result of the transfers; (c) were engaged in a business or a transaction for which any property remaining with Plaintiffs was an unreasonably small capital; or (d) intended to incur, or believed that they would incur, debts that would be beyond Plaintiffs' ability to repay as such debts matured.

227.  Accordingly, the transfers should be avoided as fraudulent pursuant to section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Bankman and Fried pursuant to section 550 of the Bankruptcy Code such transfers, or the value thereof, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## <u>COUNT X</u>
### <u>Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550</u>
### (against Defendants Bankman and Fried)

228.  Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 162 of the First Amended Complaint as though the same were set forth in full herein.

229.  Bankman and Fried received title to Blue Water, as well as various benefits from expenses incurred by FTX Trading related to Blue Water.

230.  Bankman received a $10 million gift consisting of Alameda Ltd. funds, of which $6,775,000 was withdrawn from his FTX US exchange account to bank accounts held jointly by

Bankman and Fried.  Bankman-Fried acted as a mere conduit, or, in the alternative, Bankman and Fried were subsequent transferees after the initial transfer of funds from Alameda Ltd. to Bankman-Fried, and Bankman and Fried lacked good faith with respect to such transfers.

231.   The aforementioned transfers were of property of Plaintiffs FTX Trading and Alameda Ltd.

232.   The transfers were made within two years before the Petition Date.

233.   Plaintiffs did not receive reasonably equivalent value in exchange for the foregoing transfers because they were personal gifts given for the benefit of Bankman and Fried to the detriment of FTX Trading and Alameda Ltd. for no consideration.

234.   FTX Trading and Alameda Ltd. (a) were insolvent on the date of the transfers, (b) became insolvent as a result of the transfers; (c) were engaged in a business or a transaction for which any property remaining with Plaintiffs was an unreasonably small capital; or (d) intended to incur, or believed that they would incur, debts that would be beyond Plaintiffs' ability to repay as such debts matured.

235.   Accordingly, the transfers should be avoided as fraudulent pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Bankman and Fried pursuant to section 550 of the Bankruptcy Code the transfers, or the value thereof, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of Plaintiffs' bankruptcy estates.

### COUNT XI
### Actual Fraudulent Transfer Pursuant to Bankruptcy Code §§ 544(b) and 550 and Applicable Non-Bankruptcy Law
**(against Defendants Bankman and Fried)**

236.   Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 162 of the First Amended Complaint as though the same were set forth in full herein.

237.     Under 11 U.S.C. § 544(b)(1), Plaintiffs, as debtors-in-possession with the rights and powers of a trustee, may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under law by a creditor holding an unsecured allowable claim.

238.     Under applicable law, including Cal. Civ. Code § 3439.04(a)(1) and Del. Code Ann. Tit. 6, § 1304(a)(1), a creditor may avoid a transfer made or obligation incurred by a debtor on or within 4 years before the action was brought if the debtor made the transfer or incurred the obligation with the actual intent to hinder, delay, or defraud any creditor of the debtor.

239.     The transfers were made within four years before the Petition Date.

240.     As described with particularity above, Bankman and Fried received title to Blue Water, as well as various benefits from expenses incurred by FTX Trading related to Blue Water. Bankman received a $10 million gift consisting of Alameda Ltd. funds, of which $6,775,000 was withdrawn from his FTX US exchange account to bank accounts held jointly by Bankman and Fried.  Bankman-Fried acted as a mere conduit, or, in the alternative, Bankman and Fried were subsequent transferees after the initial transfer of funds from Alameda Ltd. to Bankman-Fried, and Bankman and Fried lacked good faith with respect to such transfers.

241.     Multiple badges of fraud recognized by applicable law, including Cal. Civ. Code § 3439.04(b) and Del. Code Ann. Tit. 6, § 1304(b), permeate the aforementioned transfers, including that:

      a.   The transfers were made to close family members of Bankman-Fried with the knowledge of and/or at the direction of Bankman-Fried;

      b.   The transfers were part of a scheme to enrich and otherwise benefit Bankman and Fried;

    c.   The transfers were made to insiders of FTX Trading and Alameda Ltd., which both Bankman and Fried were under 11 U.S.C. 101(31)(B)(vi);

    d.   Material facts relating to the transfers were concealed;

    e.   The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred; indeed, Plaintiffs received no consideration; and

    f.   The transfers occurred shortly before or shortly after Plaintiffs incurred substantial debts.

242.   FTX Trading and Alameda Ltd. (a) were insolvent on the date of the transfers, (b) became insolvent as a result of the transfers; (c) were engaged in a business or a transaction for which any property remaining with Plaintiffs was an unreasonably small capital; or (d) intended to incur, or believed that they would incur, debts that would be beyond Plaintiffs' ability to repay as such debts matured.

243.   Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers.

244.   Accordingly, the transfers should be avoided, and Plaintiffs may recover from Bankman and Fried pursuant to section 550 of the Bankruptcy Code the transfers, or the value thereof, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of Plaintiffs' bankruptcy estates.

### <u>COUNT XII</u>
### <u>Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544(b) and 550 and Applicable Non-Bankruptcy Law</u>
### (against Defendants Bankman and Fried)

245.   Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 162 of the First Amended Complaint as though the same were set forth in full herein.

246.    Under 11 U.S.C. § 544(b)(1), Plaintiffs, as debtors-in-possession with the rights and powers of a trustee, may avoid any transfer of an interest of Plaintiffs in property or any obligation incurred by Plaintiffs that is voidable under law by a creditor holding an unsecured claim.

247.    Under applicable law, including Cal. Civ. Code § 3439.04(a)(2), Cal. Civ. Code § 3439.05(a), Del. Code Ann. Tit. 6, § 1304(a)(2), and Del. Code Ann. Tit. 6, § 1305(a), a creditor may avoid a transfer made or obligation incurred by a debtor without receiving a reasonably equivalent value in exchange for such transfer or obligation, on or within 4 years before the action was brought if the debtor made the transfer or incurred the obligation when it:

   a.    Was engaged or about to engage in a business or a transaction for which the debtor's remaining assets were unreasonably small in relation to the business or transaction;

   b.    Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due; or

   c.    Was insolvent at that time or became insolvent as a result of the transfer or obligation.

248.    Bankman and Fried received title to the Blue Water property, as well as various benefits from expenses incurred by FTX Trading related to Blue Water.  Bankman also received a $10 million gift consisting of Alameda Ltd. funds, of which $6,775,000 was withdrawn from his FTX US exchange account to bank accounts held jointly by Bankman and Fried.  Bankman-Fried acted as a mere conduit, or, in the alternative, Bankman and Fried were subsequent transferees

after the initial transfer of funds from Alameda Ltd. to Bankman-Fried, and Bankman and Fried lacked good faith with respect to such transfers.

249.     The transfers were made within four years before the Petition Date.

250.     The transfers were of property of Plaintiffs FTX Trading and Alameda Ltd.

251.     Plaintiffs did not receive reasonably equivalent value in exchange for the foregoing transfers because they were personal gifts given for the benefit of Bankman and Fried to the detriment of FTX Trading and Alameda Ltd., and for no consideration.

252.     FTX Trading and Alameda Ltd. (a) were insolvent on the date of the transfers, (b) became insolvent as a result of the transfers; (c) were engaged in a business or a transaction for which any property remaining with Plaintiffs was an unreasonably small capital; or (d) intended to incur, or reasonably believed that they would incur, debts that would be beyond Plaintiffs' ability to repay as such debts matured.

253.     Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers.

254.     Accordingly, the transfers should be avoided, and Plaintiffs may recover from Bankman and Fried pursuant to section 550 of the Bankruptcy Code the transfers, or the value thereof, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of Plaintiffs' bankruptcy estates.

**COUNT XIII**
**Disallowance of Claims Pursuant to 11 U.S.C. § 502(d)**
**(against Defendants Bankman and Fried)**

255.     Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 162 of the First Amended Complaint as though the same were set forth in full herein.

256.    As alleged above, Bankman and Fried are transferees of transfers avoidable under sections 544 and 548 of the Bankruptcy Code and are each a person from whom property is recoverable under section 550 of the Bankruptcy Code.

257.    By reason of the foregoing facts and pursuant to section 502(d) of the Bankruptcy Code, any claims of Bankman or Fried that have been or will in the future be asserted in Plaintiffs' Chapter 11 Cases should be disallowed unless and until Bankman and Fried have relinquished to Plaintiffs the property transferred or have paid Plaintiffs the value of such transferred property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants and grant the following relief:

(a)    Award Plaintiffs compensatory damages in an amount to be determined at trial;

(b)    Disgorgement of all of Defendant Bankman's compensation paid by Plaintiffs;

(c)    Avoid the fraudulent transfers to or for the benefit of Defendants, and direct Defendants to return to Plaintiffs the transferred property and related expenses or the value thereof, plus pre-judgment and post-judgment interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with attorneys' fees and costs;

(d)    An accounting by Defendants relating to any and all information related to Defendants' use and possession of Blue Water, and any profits realized therefrom;

(e)    Award Plaintiffs a pre-judgment writ of attachment over the amounts held in the Embed Account;

(f)    Award Plaintiffs punitive damages in an amount to be determined at trial resulting from Defendants' conscious, willful, wanton, and malicious conduct, which exhibits a reckless disregard for the interests of Plaintiffs and their creditors;

(g)     Award Plaintiffs pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

(h)     Award Plaintiffs' reasonable and necessary attorneys' fees and expenses, together with all costs of court, and investigation expenses; and

(i)     Grant Plaintiffs such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Dated: March 15, 2024
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

By:  _/s/ Matthew B. McGuire_
      Adam G. Landis (No. 3407)
      Matthew B. McGuire (No. 4366)
      Kimberly A. Brown (No. 5138)
      Matthew R. Pierce (No. 5946)
      919 Market Street, Suite 1800
      Wilmington, Delaware 19801
      Telephone: (302) 467-4400
      Facsimile: (302) 467-4450
      E-mail: landis@lrclaw.com
            mcguire@lrclaw.com
            brown@lrclaw.com
            pierce@lrclaw.com

*Counsel for the Debtors*
*and Debtors-in-Possession*

-and-

**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**

William A. Burck (*pro hac vice*)
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000
williamburck@quinnemanuel.com

Sascha N. Rand (*pro hac vice*)
Katherine A. Lemire (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
sascharand@quinnemanuel.com
katherinelemire@quinnemanuel.com

John B. Quinn (*pro hac vice*)
William R. Sears (*pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-7000
johnquinn@quinnemanuel.com
willsears@quinnemanuel.com

*Special Counsel to the Debtors*